E. E. STUESSY and Fred Crooks, Appellants,

v.

BYRD, DAVIS AND EISENBERG,
Appellees.

No. 11244.

Court of Civil Appeals of Texas.

Austin.

June 24, 1964.

Felts & Robinson, Austin, for appellants.

Byrd, Davis & Eisenberg, Austin, for appellees.

ARCHER, Chief Justice.

This is an appeal from the grant of a temporary injunction. It embraces the law of interference. Appellees, plaintiffs in the Trial Court, are practicing attorneys. Appellants, defendants in the Trial Court, are businessmen. E. E. Stuessy is the owner of the contracting business and Fred Crooks is his office manager.

Michael DeLeuil was injured in the course of his employment on January 10, 1964. He employed plaintiffs on January 11, 1964, to represent him in a possible workman's compensation suit. He started back to work, but without Stuessy's personal knowledge, during the week of March 16, 1964, but did not secure a full release from his doctor until March 21, 1964. Stuessy learned of this recovery and when DeLeuil reported for work on March 23, 1964, he (DeLeuil) was given the alternative of going back to work and dismissing any litigation or keeping his litigation and giving up his job.

The appeal is predicated on four points and are to the effect that the Trial Court abused its discretion and erred in granting the temporary injunction because appellants were exercising absolute rights; because the contract is not the type to which the law of interference applies; because there was no malice, willfulness or unlawful intent, and finally because the petition was incomplete, general, contained no specific allegations or facts, and failed to allege lack of an adequate remedy at law and was unsupported by a verified affidavit.

The facts are not in dispute, DeLeuil was an employee of Stuessy, was injured, and employed appellees as his attorneys on the day following the accident.

DeLeuil received treatment, recovered and returned to work, and was told by Stuessy that the lawsuit must be forgotten if he wanted to continue to work.

DeLeuil testified:

"A  I went into Mr. Stuessy's office.

"Q  When you got there was anybody else there?

"A  Yes, sir, Mr. Stuessy and Fred Crooks, and Mr. Stuessy introduced a man, I think an adjuster from Travelers Insurance, if I am not mistaken now.

   *     *     *     *     *     *

"Q  (Mr. Eisenberg) State for me, if you would, as accurately as possible who Mr. Stuessy introduced and the character of the introduction.

"A  I know Fred was in there. Fred Crooks brought me in the office.

"Q  What does Mr. Crooks do?

"A  I believe he is bookkeeper for Mr. Stuessy and Mr. Stuessy of course was sitting at his desk, and a man was sitting at my right, and I was sitting in front of Mr. Stuessy's desk, and I am not saying for sure because it has been a little while ago, but I believe he said, —it was a funny name, and it just hit me for a minute. I was thinking about Mr. Stuessy, but I thought he said this man is an adjuster, or something, from Travelers Insurance Company.

   *     *     *     *     *     *

"Q  All right. Now, would you tell us as accurately as possible what conversations transpired in that room that day?

"A  Well, Mr. Stuessy was concerned. You know he asked me how I was and how my back was, and he wanted to know what I was going to do. He said that I could not continue working there right now until I got rid of my lawyers. He

said he could not have somebody working for him that was going to turn around and sue him. He said that to him or to anybody else he said it might look like I was after money from hiring the lawyers, and I told him, well, I was trying to get my workmen's compensation checks, and he said, 'Well, your lawyer has them tied up,' and this other man sitting there—

\* \* \* \* \* \*

"A Well, this insurance man, like I say, I don't recall his name, but they was talking, and he said they would— \* \* \* As I was saying, Mr. Stuessy was talking, and he said, 'Well,' he said—he asked me how come I went ahead and got a lawyer. I said I was hunting compensation checks, but he said, well, it looked like to him that I was not too well interested in my job, for getting a lawyer. He said it appeared to him that I was after money by getting a lawyer. He said if I got rid of my lawyers, he said possibly there would be a settlement made right away, and then he asked that other man there, and, like I say, I can't say for sure, because I don't know who, and he asked him, and he said, 'Yes, your lawyers have got your money tied up.' That is what he said.

\* \* \* \* \* \*

"A That's right, he did that at the first. He said that he was going to have to take me off the payroll until something was done about these lawyers. He said he could not have someone working for him who was going to turn around and sue him. He was very conscientious about that.

"Q Was there a subsequent meeting with Mr. Stuessy?

"A Yes, sir, there was one other. It was just Mr. Stuessy there and Fred Crooks.

"Q When did that occur?

\* \* \* \* \* \*

"A I believe Mr. Pannell—it was Mr. Pannell come and got me. Fred and them called me and said Mr. Stuessy wanted to talk to me, and I went down to the office, and Fred Crooks and Mr. Stuessy was there, and he wanted to know what I decided about the lawyer deal, you know, about firing you all or going to keep you or what. I told him I was going to talk to my dad, which I did, and I told him I would let him know by dinner that day, which I never did, because I went to work and never got a chance to, but I consulted you all about that, and I told you about that meeting, and he was talking about a deal that if I would get a release from you all, I could come back and get my job back.

\* \* \* \* \* \*

"Q Do you want your job back with Mr. Stuessy?

"A Yes, sir, I would like to.

"Q Do you want to keep your lawyer?

"A Yes, sir, I do.

"Q If you have to choose between one or the other, which one do you choose?

"A My lawyer, sir."

Mr. DeLeuil is not now and has not been in the employment of Stuessy for some time, but is employed elsewhere.

"\* \* \* The granting or refusing of a temporary injunction is subject to a very different character of appellate review from the granting or refusing

of a permanent injunction. The trial court is clothed with broad discretion in determining whether or not to issue a temporary injunction to preserve the rights of the parties pending a final trial of the case, and when that discretion is exercised its order should not be overturned unless the record discloses a clear abuse of discretion." Texas Foundries, Inc. v. International Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460.

Appellees' contract with DeLeuil is one within the protection of equity, involving attorney and client relationship, and the Trial Court has wide discretion in granting temporary injunctions. Goss v. Star Engraving Company, Tex.Civ.App., El Paso, 377 S.W.2d 207.

The pleadings in this case are sufficiently specific and we have set out facts that are sufficient in effect to allege that appellees had no remedy at law.

The testimony was not in any manner denied by the defendants, who were present. Magnolia Petroleum Co. v. State, Tex.Civ. App., 218 S.W.2d 855, er. ref., n. r. e.; Thrift Finance Company v. State, Tex.Civ. App., 351 S.W.2d 653, er. ref., n. r. e.

Appellants contend that a contract by which an attorney is employed is unenforceable. This is incorrect. See 7 Tex. Jur.2d, Attorneys At Law, Sec. 113.

Appellants also contend that they have a legitimate interest of their own to serve in demanding that Mr. DeLeuil breach his contract with appellees or lose his job, i. e. freedom from litigation. We find no evidence here that Mr. DeLeuil was threatening to sue his employer or that he had any legal grounds for such a suit. The only litigation which appears to be in sight is against the compensation insurance carrier of appellant Stuessy.

We have given careful consideration to appellants' brief and the authorities cited but believe the Trial Court's order granting the temporary injunction was proper.

The judgment of the Trial Court is affirmed.

Affirmed.