**TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Appellant,**

v.

**AMERICAN NATIONAL PETROLEUM COMPANY, On Behalf of Itself and Oil Investments, Ltd., Appellees.**

No. 9602.

Court of Appeals of Texas, Texarkana.

Nov. 8, 1988.

Rehearing Denied Dec. 20, 1988.

Murray Fogler, Roger Townsend, Fulbright & Jaworski, Houston, for appellant.

James R. Leahy, Baker, Brown, Sharman & Parker, Houston, for appellees.

PER CURIAM.

Transcontinental Gas Pipe Line, Inc. ("TRANSCO") appeals a judgment granted to American National Petroleum Co. ("ANPC") and Oil Investments, Ltd. ("Oil Investments"). TRANSCO contests the award to ANPC and Oil Investments of $3,886,715 in damages for breach of gas purchase contracts, $16,000,000 as exemplary damages for tortious interference with agreements between ANPC, Oil Investments and others, $1,000,000 in attorney's fees and a permanent injunction restraining TRANSCO from specified conduct. ANPC and Oil Investments appeal from that part of the judgment requiring ANPC to provide TRANSCO with 31,550 mcf [1] of gas which TRANSCO had paid for but not received and from an award to TRANSCO of $21,080 as attorney's fees.

ANPC and Oil Investments are independent producers owning fractional interests

---

1. *Mcf* is an abbreviation for one thousand cubic feet, a standard measurement for volumes of natural gas.

in two gas wells in the Vermillion field in the Gulf of Mexico off the Louisiana coast. ANPC also owns a fractional interest in five gas wells in the Oakvale field in Mississippi. Oil Investments owns no interest in that field. TRANSCO buys gas from ANPC and Oil Investments under a 1981 contract, as amended, for the Vermilion field and from ANPC under a 1979 contract, as amended, for the Oakvale field.

The Vermilion and Oakvale contracts obligated TRANSCO to take-or-pay for specified annual and monthly percentages of ANPC's and Oil Investments' gas delivery capacity.

ANPC and Oil Investments were parties to a gas balancing agreement[2] with the other fractional interest owners in the Vermilion field. In another agreement, the owners designated Samedan Oil Corporation ("Samedan") as the gas operator for the field. Under the agreements, if a particular owner's working interest was underproduced and another owner's interest was overproduced, the underproduced owner could ask the gas operator to bring him back into balance with the other working interest owners by reallocating an appropriate amount of the sales proceeds from gas taken by TRANSCO. The gas operator received monthly from TRANSCO a notice (called a "nomination") of how much gas TRANSCO intended to buy from the fields for that month. The gas operators would then instruct TRANSCO how to allocate the payments to the various working interest owners in the field in accordance with their respective ownership interests and with due regard for underbalanced and overbalanced situations. ANPC entered into similar agreements with the other owners in the Oakvale field. APC Operating Partnerships ("APC") was designated as the gas operator for that field.

As market conditions changed, excess capacity occurred. In 1983, at TRANSCO's request, the *Vermilion* contract was modified by reducing the annual take-or-pay percentage obligation and by adding a "market-out" clause which permitted TRANSCO to reduce the contract price to be paid ANPC and Oil Investments for their gas when, in TRANSCO's sole opinion, the existing contract price would be uneconomic to TRANSCO or its customers.[3] ANPC and Oil Investments contend, and a TRANSCO official conceded in testimony, that TRANSCO was required to exercise the market-out provision fairly, honestly and in good faith when setting a new price for the gas to be taken. The amended Vermilion contract provided that if ANPC and Oil Investments were dissatisfied with a market-out price established by TRANSCO, their *sole remedy* was to request that TRANSCO release all of their gas obligations. The remedy could only be exercised, however, if they produced evidence to TRANSCO that they had a buyer willing to pay a gas price higher than that set by TRANSCO as the new market-out price.[4]

In 1984, again at TRANSCO's request, the *Oakvale* contract was amended by deleting TRANSCO's take-or-pay obligation altogether and instead required that TRANSCO take ANPC's gas production ratably with other producers in the Oakvale field. ANPC also agreed to participate in a "market maintenance program" established by TRANSCO under which ANPC's Oakvale gas was temporarily sold at reduced prices in order to remain competitive with the existing market conditions.

By 1985, gas prices had dropped drastically, and TRANSCO took various actions

---

**2.** A gas balancing agreement is a contract executed by the various owners of a gas well setting forth the manner in which production from the well will be balanced among the owners in the event that one owner sells more of the gas stream from the well than other owners. Imbalances inevitably occur whenever a buyer takes gas from a well which is also owned in part by persons other than his seller.

**3.** These provisions are found in Section 6, Article XI, "PRICE," to the gas purchase agreement executed on October 5, 1981, as ratified and amended on June 9, 1983.

**4.** "Market-out" clauses allow the purchaser to reduce the price it pays whenever it determines that the market into which it sells will not bear the currently-demanded price. R. Hemingway, *The Law of Oil and Gas* § 7.4 (2d ed. 1983).

which it contends reduced its obligations for taking the higher priced gas under its Vermilion and Oakvale contracts. TRANSCO, which bought gas from approximately 1400 producers such as ANPC and Oil Investments, developed an "omnibus agreement" under which the producers had to waive any outstanding liability claims against TRANSCO and agree to a lower price and reduced purchase obligations for their gas. To pressure the producers into signing the agreement, TRANSCO adopted a policy of taking only three percent of the gas capacity of each nonsigning producer, regardless of take-or-pay or minimum-take requirements or ratable-take clauses in its contracts with the producers. A TRANSCO official conceded in testimony that TRANSCO took more than three percent of the gas of those producers who signed the agreement on TRANSCO's terms, and also testified that TRANSCO's objective was to place financial pressure on the nonsigners to induce them to waive their liability claims against TRANSCO, agree to a price for their gas which was considerably less than the price to which they previously had agreed, and to accept the proposed omnibus agreement.

TRANSCO elected to establish its market-out price on the basis of the market price for "spot" gas, which is gas sold on a short term, interruptible basis and which is not dedicated to a specific buyer. As such, it was less expensive than the "system" gas sold under the long-term dedicated and uninterruptible contracts between TRANSCO and its producers, such as ANPC and Oil Investments. The result was lower prices offered to the producers, and TRANSCO justified this policy on the ground that federal regulation required it to buy gas at the lowest price available.

TRANSCO applied its three-percent policy to ANPC's and Oil Investments' gas in both the Vermilion and Oakvale fields, even though ANPC and Oil Investments offered all of their gas reserves to TRANSCO. Moreover, TRANSCO set the Oakvale contract gas price for ANPC using a market-out method, even though the Oakvale contract had no such provision. A TRANSCO official testified that the company focused

pressure on producers who refused to sign the proposed omnibus agreement without regard to whether TRANSCO had a right to reduce the prices. TRANSCO's witness also admitted that TRANSCO paid more to the settling producers for their gas than it did for the gas purchased from ANPC and Oil Investments and others who refused to waive their liability claims or to sign the agreement.

TRANSCO concedes in its brief that as a result of its three percent policy, it did not take the monthly minimum required volumes from November 1985 through July 1986 or take the contract annual minimum quantity for the year ended June 30, 1986. It also conceded that as another result of that policy, ANPC and Oil Investments became underbalanced in the Vermilion field.

In November, 1986, ANPC and Oil Investments asked their gas operators, Samedan and APC, to bring them back into balance in the Oakvale and Vermilion fields. The operators passed this request on to TRANSCO. On December 1, 1986, TRANSCO vice-president for purchasing Phil McGowan responded in two letters. One concerned the Oakvale field and included the following language:

> The purpose of this letter is to reiterate that until such time as ANPC and Transco enter into a settlement agreement Transco will continue to regard ANPC as a non-settling producer and we will take gas from you accordingly. Necessarily, until a settlement is reached with you, we will not take from you an additional twenty-five percent (25%) of each over-produced working interest owners' percentage of production from the referenced wells in order to make up under-production.

An ANPC witness testified that TRANSCO agents told ANPC officials that it would not begin to take ANPC's pro rata share of gas under the Vermilion contract until ANPC replaced both the Vermilion and Oakvale contracts with the proposed omnibus agreement.

McGowan testified that TRANSCO advised the gas operators that, if they insist-

ed on revised allocations to bring the appellees into balance, TRANSCO would not honor the allocations and that it would refuse to take *any* gas from the ANPC's and Oil Investments' interest in the Vermilion and Oakvale fields. TRANSCO argues in a supplemental brief that this is a mischaracterization, but the record contradicts TRANSCO's disclaimer. McGowan was questioned at trial as to the meaning of the letter and answered as follows:

Q. And what you were trying to tell Samedan and Apache [APC] that if you do that [ask that ANPC and Oil Investments be brought back into balance] we will not buy any gas. That was the purpose of your letter, wasn't it?

A. [by McGowan] I believe that is right.

TRANSCO characterizes this testimony as being merely a "stray comment." The clear import of the testimony, however, is that TRANSCO would not buy *any* gas from ANPC and Oil Investments if their gas operators, Samedan and APC, insisted to TRANSCO that they be brought back into balance. There was other testimony which indicated that both gas operators thereafter told ANPC and Oil Investments that "their hands were tied" and "they couldn't do any thing about" enforcing the provisions of the gas balancing agreements with other producers in the Vermilion and Oakvale fields.

McGowan also testified that in order to bring ANPC and Oil Investments back into balance, TRANSCO would not have had to take *any additional* gas; rather, they merely would have had to reallocate payments for gas already taken. He further testified that reallocation as requested by ANPC and Oil Investments through their gas operators would have permitted TRANSCO to pay *less* for the gas taken because of other transactions affecting TRANSCO's buying prices at that time.

ANPC and Oil Investments sued TRANSCO for breach of those two contracts and for breach of a duty of good faith in performing the contracts. They also sued TRANSCO for tortious interference with

their gas balancing agreements with other parties.

On the special issues submitted, the jury found that TRANSCO failed to act in good faith in setting the market-out price in the Vermilion contract. Based upon that finding, it awarded $348,211 for failure to purchase the required *monthly* minimum quantities of gas, $352,875 for failure to purchase or pay for the required *annual* minimum quantities of gas, and $637,900 for failure to act in good faith in setting the market-out price for gas *actually purchased.* TRANSCO concedes in its brief that there was sufficient evidence to support these findings, but it insists that such breaches were contractual rather than tortious and that the findings were immaterial because of the sole remedy provisions in the contract.

The jury further found that, apart from setting the market-out price, TRANSCO failed to act in good faith in the performance of its contracts with ANPC and Oil Investments and that such failure was a proximate cause of damages to ANPC and Oil Investments; that TRANSCO interfered with the gas balancing agreements between ANPC, Oil Investments and their co-interest owners in the Vermilion and Oakvale fields; that such interference was without legal justification or excuse and proximately caused damages to ANPC and Oil Investments; and that TRANSCO acted with malice in the commission of these actions. It awarded $16,000,000 in exemplary damages to ANPC and Oil Investments.

By prior agreement of the parties, certain issues were submitted to the court with respect to the calculation of the damages sustained by ANPC as a result of TRANSCO's failure to pay the proper amount for volumes of gas owned by ANPC and taken from the *Oakvale* field. The court's award of $881,172 in damages to ANPC for that failure is not contested by TRANSCO.

The court also awarded $1,000,000 attorney's fees to ANPC and Oil Investments on the basis of evidence presented at a hearing before the court.

On motion by ANPC and Oil Investments for judgment non obstante veredicto (for increased actual damages notwithstanding the amounts awarded by the jury), the court modified the jury awards so as to provide $783,383, in lieu of $348,211, for TRANSCO's failure to purchase the required *monthly* minimum volumes of gas. The court calculated the damages by disregarding the market-out price, which the jury found had been set in bad faith, and multiplying what it termed the last undisputed contract price applicable for the period in which the volumes of gas should have been taken by the admitted volumes of gas which should have been taken pursuant to the minimum-take provisions of the Vermilion contract. Using a similar formula, the court awarded $726,723, in lieu of the jury's finding of $352,875, for TRANSCO's failure to take-or-pay for the required *annual* minimum volumes of gas. The court also awarded $2,376,609, in lieu of the jury's finding of $637,900, for TRANSCO's failure to act in good faith in setting the market-out price for volumes of gas actually taken. TRANSCO challenges the trial court's action in disregarding the jury's awards and in substituting higher amounts of damages than those awarded by the jury.

The judgment further made permanent a December 18, 1986, temporary injunction which restrained and enjoined TRANSCO:

(1) from refusing to keep ANPC ratable with TRANSCO's other producer/suppliers of gas in the Oakvale field for the term of the Oakvale contract;

(2) from interfering with ANPC's contractual relationship with its gas operator, APC, and from refusing to pay the proper price for gas purchased from the Oakvale field in accordance with allocations made by APC, for the term of the Oakvale contract;

(3) from refusing to take and pay the proper price for the monthly minimum quantities of gas under the minimum-take provisions, and for the annual sum of the daily minimum quantities of gas under the take-or-pay provisions, of its contracts with ANPC and Oil Investments covering gas purchased from the Vermilion field, until expiration of the Vermilion contracts; and

(4) from interfering with ANPC's and Oil Investments' contractual relationships with their gas operator, Samedan, by refusing to pay for gas purchased in accordance with the allocations made by Samedan until expiration of the Vermilion contracts.

The court also ordered that TRANSCO should receive $21,080 as attorney's fees and 31,550 mcf of natural gas from ANPC's interest in the Oakvale field based on its counterclaim against ANPC that it had paid ANPC for that amount of gas but had not received it. The record indicates that TRANSCO's counterclaim was heard in a contested hearing before the court on July 23, 1987, subsequent to the jury's verdict on special issues on July 2, 1987.

The court's judgment was signed on July 24, 1987. In August 1987, TRANSCO filed suit in a Delaware court seeking to litigate issues related to determination of the "proper price" for gas to be purchased in August and September 1987 from ANPC and Oil Investments. On motion of appellees, the court enjoined TRANSCO from pursuing its Delaware action or any similar action seeking to relitigate issues which already were—or which could have been—decided. The court declined to hold TRANSCO in contempt for filing the lawsuit in Delaware.

TRANSCO brings fourteen points of error, alleging:

(1) as a matter of law it committed no separate and independent tort and caused no tort damages upon which an award of exemplary damages can be predicated;

(2) that as a matter of law the evidence established that TRANSCO acted with legal justification or excuse, or alternatively, that there was no evidence or insufficient evidence to support the jury's contrary finding that it had no legal justification or excuse for tortious interference with ANPC's and Oil Investments' gas balancing contracts;

(3) that there was no evidence or that there was insufficient evidence to support the jury findings that TRANSCO's interfer-

ence with gas balancing agreements had proximately caused damages;

(4) that there was no evidence or that there was insufficient evidence to support the jury's finding that TRANSCO had acted with malice;

(5) that there was no evidence or insufficient evidence to support the jury's award of $16,000,000 in exemplary damages and alternatively that the award was excessive and constituted an abuse of discretion;

(6) that the award of $16,000,000 in exemplary damages violates the Eighth Amendment prohibition against excessive fines;

(7) that there was no evidence or that there was insufficient evidence to support the jury's finding that TRANSCO failed to exercise good faith in setting market-out prices and therefore there was no liability predicate to support the award of damages for failure to exercise good faith in setting the market-out price under the Vermilion contract;

(8) that ANPC's and Oil Investments' sole contractual remedy renders the jury's findings of actual damages for breach of the Vermilion contract immaterial;

(9) that the trial court erred in granting the motion for judgment n.o.v. in favor of ANPC and Oil Investments as to actual damages because there was legally sufficient evidence to support the jury's findings, and the higher award rendered by the court was not established as a matter of law;

(10) that the award of $1,000,000 for attorney's fees was excessive and an abuse of discretion, and there was no evidence or insufficient evidence to support the award;

(11) that the trial court erred in granting a permanent injunction ordering TRANSCO to pay a "proper" price for gas, because the injunction is void;

(12) that the trial court erred in enjoining TRANSCO from litigating disputes about future market-out prices in another forum;

(13) that there was no evidence, or there was insufficient evidence, to support certain of the trial court's findings of fact

underlying its injunction against litigation in another forum; and

(14) that the trial court erred in ordering TRANSCO to pay sums to ANPC and Oil Investments under its ruling on their first motion for contempt.

In two cross-points, ANPC and Oil Investments urge that the trial court erred in granting TRANSCO a recovery for volumes of gas paid for but not taken in the Oakvale field because such relief was not pleaded for and in allowing TRANSCO recovery of attorney's fees on its counterclaim because TRANSCO failed to establish a breach of contract.

## CONTRACTUAL SOLE REMEDY

We first consider TRANSCO's contention that ANPC and Oil Investments are bound by a contractual sole remedy that renders the jury's findings of actual damages for breach of the Vermilion contract immaterial. The contention is based on provisions of the Vermilion field gas purchase contract which authorize TRANSCO, as buyer, to establish market-out prices for the gas which in TRANSCO's sole opinion would meet the economic conditions of the market. By an amendment executed on June 9, 1983, the gas purchase contract provides in part as follows:

Seller shall have up to but not more than ninety (90) days to notify Buyer in writing whether it elects to continue sales hereunder at the price contained in Buyer's notice or to request the release of all gas subject to this Article XI, Section 6 of this agreement. Should Seller fail to give written notice of its election within such ninety (90) day period, Seller shall be deemed to have elected to continue sales hereunder at the price contained in Buyer's notice. Such right to request the release of the gas is conditioned upon Seller's ability to sell the gas at a higher price than that contained in Buyer's notice. Such release shall be effective at the expiration date of said ninety (90) day period, subject only to receipt by Buyer of Seller's request, accompanied by evidence that such other purchaser is willing to pay a higher price.

. . . .

The provisions of this Section 6 shall not be subject to arbitration and if the price contained in Buyer's notice is not acceptable to Seller, Seller shall have as its sole remedy the right to release the gas subject to the provisions above.[5]

Section 2.719 of the Texas Business and Commerce Code relates to contractual modification of remedy. In relevant part, it specifies that an agreement may provide for remedies in addition to or in substitution for those provided in the Code and may limit or alter the measure of damages recoverable. It further specifies that where a remedy is expressly agreed to be exclusive, it is the sole remedy, but where circumstances cause an exclusive remedy to fail of its essential purpose, other remedies may be had as provided in the Code. Tex.Bus. & Com.Code Ann. § 2.719 (Vernon 1968).

■ Agreements creating a sole remedy have been upheld by Texas courts. *Calloway v. Manion*, 572 F.2d 1033 (5th Cir. 1978) (applying Texas law); *Lankford v. Rogers Ford Sales*, 478 S.W.2d 248 (Tex. Civ.App.—El Paso 1972, writ ref'd n.r.e.). Other courts have upheld an exclusive contractual remedy, provided that the intent of the parties to so limit the remedy is clearly expressed or discernable. *Accent Builders Co. v. Southwest Concrete Systems*, 679 S.W.2d 106 (Tex.App.—Dallas 1984, writ ref'd n.r.e.); *Bifano v. Young*, 665 S.W.2d 536 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Vandergriff Chevrolet Co. v. Forum Bank*, 613 S.W.2d 68 (Tex.Civ.App. —Fort Worth 1981, no writ); *Stergios v. Babcock*, 568 S.W.2d 707 (Tex.Civ.App.— Forth Worth 1978, writ ref'd n.r.e.); *Tabor v. Ragle*, 526 S.W.2d 670 (Tex.Civ.App.— Fort Worth 1975, writ ref'd n.r.e.). In the case at bar, the intent of the parties to establish an exclusive remedy for *dissatisfaction with a nominated market-out*

*price for gas* is clearly expressed. That remedy, however, does not provide relief for breaches of express or implied covenants of the gas purchase agreement which are not related to the market-out price.

■ It is not the function of the court to relieve a party from a provision of a freely negotiated contract unless the remedy made available violates the law or public policy. *Cantrell v. Broadnax*, 306 S.W.2d 429 (Tex.Civ.App.—Dallas 1957, no writ); *West Texas Utilities Co. v. Huber*, 292 S.W.2d 702 (Tex.Civ.App.—Eastland 1956, writ ref'd n.r.e.). The remedy here provided does not violate any law or public policy.

The parties involved were both in the oil and gas business. ANPC and Oil Investments contend that they did not exercise the remedy because they were not aware that TRANSCO was not setting the prices in good faith. These companies had, under the terms of the contract, ninety days before the nominated price went into effect in which to determine if it was a proper price under the market. This placed an obligation on them to make a determination as to whether the price was acceptable to them, and if not, to exercise the sole remedy provided.

The contract provision clearly allowed the sellers to withdraw the gas and resell it to another producer rather than accept the reduced price. Furthermore, it allowed sufficient time (ninety days)[6] for the seller to look for another purchaser before electing to accept the price or cancel the contract. The parties were bound to the sole remedy set forth in the contract as to the setting and acceptance of proposed market-out prices.

The sole remedy provision related to dissatisfaction with market-out prices set by TRANSCO did not limit or restrict ANPC and Oil Investments from legally enforcing

---

5. This amendment also provides that if the seller exercises its sole remedy, then TRANSCO will use reasonable efforts to enter into an agreement with mutual agreeable terms and conditions to provide for the transportation of the gas through TRANSCO's pipelines.

6. Sample analagous clauses allow the seller thirty days, *Kennedy & Mitchell v. Anadarko Production Co.*, 243 Kan. 130, 754 P.2d 803 (1988) and sixty days, D. Long, *Current Developments in Gas Contracts, Sales and Marketing*, in State Bar of Texas, Advanced Oil, Gas and Mineral Law Course G4 (1987).

other express or implied covenants of the gas purchase agreements which were not related to the setting of market-out prices. The sole remedy specifically applies to nominated market-out prices only. There were express provisions in the agreements which required TRANSCO to purchase specified monthly minimum quantities of gas and to purchase or pay for specified annual minimum quantities of gas. TRANSCO conceded in testimony and in its brief that it breached those two provisions. The jury awarded damages to ANPC and Oil Investments for TRANSCO's breach. In an appendix to its brief, TRANSCO presents calculations reflecting that it does not contest the award of damages for those breaches, but that it does contest the amount of damages substituted by the trial court. TRANSCO suggests that the damages should have been computed by using the market-out prices which it set during the relevant periods, rather than the June 1981 contract price used by the trial court.

By omission from its calculations of damages which it suggests should have been awarded, TRANSCO does contest the award by the jury of damages for its failure to set in good faith the market-out prices for gas actually purchased, on the basis that this claim was prevented by the sole remedy provision of the gas purchase agreement. We agree.

Because we so hold, we need not reach TRANSCO's points of error related to findings of lack of good faith in setting market-out prices for gas.

### THE JUDGMENT N.O.V.

■ TRANSCO next contends that the trial court erred in disregarding the jury's finding as to the amount of damages for TRANSCO's failure to purchase the required monthly minimum quantities of gas, failure to take or pay for the required annual minimum quantities of gas, and failure to act in good faith in setting the market-out price for volumes of gas actual-

ly purchased. It argues that there was evidence to support the *jury's* findings as to those damages and that the trial court therefore should not have substituted higher damages than those found by the jury.

In its judgment n.o.v. in favor of ANPC and Oil Investments, the trial court stated that the jury finding of TRANSCO's bad faith in setting the market-out price established the proper damages for ANPC and Oil Investments under special issue no. 2 as a matter of law. We have already determined that ANPC and Oil Investments had contracted for a sole remedy concerning objectionable setting of the market-out price. Therefore, ANPC and Oil Investments would be entitled to damages for TRANSCO's failure to take the required volumes of gas. Those damages, however, would be based upon the market-out price set by TRANSCO and not on the original contract price as directed by the court in its judgment n.o.v. TRANSCO does not complain of the jury findings of Vermilion contract damages of $701,086 including $348,211 for failure to purchase the required monthly minimum quantities of gas and $352,875 for failure to purchase or pay for the required annual minimum quantities of gas.[7]

The trial court erred in granting a judgment n.o.v. in lieu of the jury's findings, because the trial court based its damages on the original contract price as a matter of law which pursuant to the terms of the contract had been changed to market-out prices without ANPC and Oil Investments exercising their sole remedy. The total jury findings for the failure to purchase the required minimum quantities of gas should be restored in the amount of $701,086 for the Vermilion contract. The award of $2,376,609 in damages by the trial court for TRANSCO's failure to exercise good faith in setting the market-out price for gas actually purchased must be deleted, in that the sole remedy provision precludes money

---

7. The record does not show the exact method used by the jury to determine the amount of these damage awards, but we observe that TRANSCO admits to having breached the minimum-take and take-or-pay provisions of the Ver-

milion contracts, and it further argues in its brief that these damage findings by the jury were well within the range of possible values offered by TRANSCO and the appellees.

damages related to the setting of market-out prices. The court's award of $881,172 in damages from the Oakvale field is not challenged.

## THE $16 MILLION PUNITIVE DAMAGES AWARD

TRANSCO contends that the jury improperly awarded ANPC and Oil Investments $16 million as exemplary damages. The jury was instructed that, in determining whether to award exemplary damages against TRANSCO, it could take into account

> not merely the act or acts of a Defendant, ... [but also] all the circumstances, including (1) the extent of any damages suffered by Plaintiff; (2) the nature of the wrong; (3) the frequency of the wrongs committed; (4) the character of the conduct involved; (5) the degree of the wrongdoer's culpability; (6) the situation and sensibilities of the parties concerned; (7) the extent to which the Defendant's conduct offends a public sense of justice and propriety; and (8) the size of an award needed to deter similar wrongs in the future.

Exemplary damages are not recoverable for a breach of contract. *Texas National Bank v. Karnes,* 717 S.W.2d 901 (Tex.1986). Neither gross negligence nor malicious and oppressive conduct in the breach of a contract nor an intentional breach will entitle an injured party to exemplary damages. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986); *Texas Power & Light Co. v. Barnhill,* 639 S.W.2d 331 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.).

We cannot determine from the record whether the jury, in awarding the punitive damages, took into account the damages which had been found by the jury for TRANSCO's breach of contract by failing to purchase or pay for the required monthly and annual volumes of gas or those damages found for TRANSCO's breach of contract by failure to exercise good faith and fair dealing in the performance of its contracts to purchase gas from ANPC and Oil Investments. We also cannot determine whether the jury limited its consideration in determining the punitive damage awards to its finding of interference by TRANSCO with ANPC's and Oil Investments' balancing agreements with other co-interest owners in the Vermilion and Oakvale fields. The jury was not instructed to do so.

TRANSCO contends that two of ANPC's and Oil Investments' three theories of liability are contractual and therefore, even if TRANSCO was malicious, its acts could not give rise to exemplary damages. The two relevant theories of liability are (1) TRANSCO's alleged malicious breach of a duty to act in good faith and fair dealing *in setting the market-out price* in the Vermilion field gas purchase contracts, and (2) TRANSCO's alleged malicious breach of a duty to act in good faith *in the performance of its gas purchase contracts* with ANPC and Oil Investments.

ANPC and Oil Investments counter that failure to act in good faith in the execution of a contract constitutes a tort, citing *Arnold v. National County Mutual Fire Insurance Co.,* 725 S.W.2d 165, 167 (Tex. 1987). That case, however, involved parties to an *insurance* contract. The court held that a special relationship exists in insurance contracts, arising from the unequal bargaining power of the parties and the nature of the contract which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims.

In another recent *insurance* case (workers' compensation), the Texas Supreme Court reiterated that a tort duty of good faith and fair dealing arises out of the *special trust relationship* between the insured and the insurer. *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex.1988). The standard of conduct of the lessee in an *oil and gas lease,* however, is not that of a fiduciary, but rather that of a reasonably prudent operator. *Texas Oil and Gas v. Hagen,* 31 Tex.Sup.Ct.J. 140 (December 19, 1987) [available on WESTLAW, 1987 WL 47847] (pending motion for rehearing). In *Hagen,* royalty owners sued

and recovered for breach of the implied covenant to market gas with good faith and reasonable diligence. The Supreme Court observed that Texas has long recognized an implied duty on the part of lessees to market production and that the standard of care which this duty carries is the "prudent operator" standard. *Id.* The Court held: "An oil and gas lessee breaches the implied covenant to reasonably market gas if the lessee fails to obtain terms in the gas sales contract that a reasonably prudent operator would have obtained." *Id.* The Supreme Court has also held that the rights and duties of a lessor and lessee in an oil and gas lease are determined by the lease and are *contractual,* and that a breach of an implied covenant (to protect against drainage) was an action sounding in contract and would not support recovery of exemplary damages absent proof of an independent tort. *Amoco Production Co. v. Alexander,* 622 S.W.2d 563 (Tex.1981).

■ Although the case before us does not involve an oil and gas lease, we conclude by analogy that the Vermilion gas purchase contracts between TRANSCO and ANPC and between TRANSCO and Oil Investments were accompanied by implied covenants to act in good faith in determining the market-out price and in performing the contract, that a breach of those covenants would be contractual, and, even if malicious, would not support an award of exemplary damages absent a finding of an independent tort with accompanying actual damages. *Texas National Bank v. Karnes, supra; Amoco Production Co. v. Alexander, supra* (the broad implied covenants in an oil and gas lease are to develop the premises, protect the leasehold, and manage and administer the lease); *Amoco Production Co. v. First Baptist Church of Pyote,* 611 S.W.2d 610 (Tex.1980) (recognizing an implied covenant of good faith in marketing gas); R. Hemingway, *The Law of Oil and Gas* §§ 8.1, 8.9(c) (2d Ed.1983).

■ As a third theory of liability, ANPC and Oil Investments urge that TRANSCO tortiously interfered with their gas balancing agreements with their co-owners in the Vermilion and Oakvale fields. To es-

tablish the necessary elements of a claim of tortious interference, a plaintiff must show (1) that the defendant maliciously interfered with plaintiff's contract with other parties and (2) that the interference was without legal justification or excuse. *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105 (Tex. 1984). The existence of gas balancing agreements between ANPC, Oil Investments and their co-owners in the Vermilion and Oakvale fields is not contested.

■ The jury in the instant case found that TRANSCO interfered with the gas balancing agreements without legal justification or excuse, that the interference was with malice, and that the interference proximately caused damages to ANPC and Oil Investments. However, there was no issue or finding by the jury as to an amount of *actual* tort damages to support the award of exemplary damages, as required by *Nabours v. Longview Savings & Loan Association,* 700 S.W.2d 901 (Tex.1985). A plaintiff may receive exemplary damages for breach of an implied covenant only if there is at least one finding of an independent tort with accompanying *actual damages.* *International Bank, N.A. v. Morales,* 736 S.W.2d 622 (Tex.1987), *citing Texas National Bank v. Karnes, supra,* at 903, and *Jim Walter Homes, Inc. v. Reed, supra; see also, Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986); *Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 655 (Tex.App.— Houston [14th Dist.] 1987, writ denied).

This Court may not make original findings of fact, and we would exceed our authority if we were to infer that a finding of actual damages in tort had been made or should be deemed to have been made. *Texas National Bank v. Karnes, supra,* at 903; *Lovelace v. Sabine Consolidated, Inc., supra.*

■ ANPC and Oil Investments argue that TRANSCO, in a colloquy between the trial court and counsel during a hearing regarding issues to be included in the jury charge, waived the submission of actual tort damages to the jury. In relevant part, that colloquy included the following statements by TRANSCO's counsel:

We object to the submission of Special Issue No. 5 and 6 and 7 on the interference for the same reason, that is because of any actual damages which they may have sustained are the same as the Vermilion take or pay claim and the minimum take claim and the submission of those issues are unnecessary. [Special Issues 5, 6, and 7 relate to the claim of tortious interference with a business relationship].

Just to be clear we are not objecting to the failure of the plaintiff to submit a damage issue in connection with Special Issues 5, 6, and 7 on the interference claim for the same reason we stated earlier in that we agree in the damages which would be recoverable from the defendant in an affirmative finding are the same as the damages recoverable for the Vermilion take or pay claim and the minimum pay claim in the Oak Vale (sic) claim.

The remarks of TRANSCO's counsel to the court constitute neither a judicial admission nor a stipulation which dispensed with the requirement for the submission of an issue to the jury regarding the amount of actual tort damages. It was the duty of ANPC and Oil Investments, as plaintiffs, to allege, prove and secure jury findings not only on the *existence* but also on the *specific amount* of actual damages sufficient to support the award of exemplary damages. This is necessary in order for an appellate court to determine if the exemplary damages award bears a rational relationship to the actual damages in tort found to exist. *Texas National Bank v. Karnes, supra; Jim Walter Homes v. Reed, supra,* at 618; *Nabours v. Longview Savings & Loan Association, supra,* at 903; *Lovelace v. Sabine Consolidated, Inc., supra.*

ANPC and Oil Investments further argue that the *measure* of damages for tortious interference with a contract is the same as the measure of damages for a breach of contract. We agree that the measure is the same in that either in a tortious interference with a contract or in case of a breach of a contract, the court attempts to put the plaintiff in the same economic position that he would have been in had there been no breach or interference with the contract. *Capital Title Co. v. Donaldson,* 739 S.W.2d 384 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Armentariz v. Mora,* 553 S.W.2d 400 (Tex.Civ. App.—El Paso 1977, writ ref'd n.r.e.). In the present case, however, we are dealing with two different contracts: a gas purchasing agreement between TRANSCO and each appellee; and a gas balancing agreement between the appellees and other parties, excluding TRANSCO. The only jury finding of actual damages was for TRANSCO's breach of the gas purchase agreements to which TRANSCO was a party. Because it *was* a party to the gas purchase contracts, TRANSCO could not be held to have interfered tortiously with those contracts, and such contracts thus could not be a basis for an award of exemplary damages. *See Frost National Bank v. Matthews,* 713 S.W.2d 365 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). The actual damages for tortious interference by TRANSCO with the gas balancing agreements, to which TRANSCO was not a party, would be different from the actual damages for TRANSCO's breach of the separate gas purchase agreements between it and the appellants because the damages arise from the different agreements.

TRANSCO used leverage as a party to the gas purchase contracts to interfere tortiously with a gas balancing contract to which it was not a party. The jury was not asked, however, to determine an amount of actual damages for tortious interference with the gas balancing contract, nor was there any evidence presented as to the extent of actual damages caused by such tortious interference with that contract.

For the tortious interference, the actual damages which would restore appellees to the position they would have been in had there been no interference would be the difference between what appellees actually received for their gas and the amount which they would have received had there been no tortious interference by TRANSCO with the gas balancing agreements.

ANPC and Oil Investments argue that *Cielo Dorado Development v. Certainteed Corp.*, 744 S.W.2d 10 (Tex.1988), requires us to reach a contrary conclusion. In *Cielo*, the court held that the defendant's failure to object to nonsubmission of an issue on the notice required by Tex.Bus. & Com.Code Ann. § 17.50A (Vernon 1987) resulted in the omitted issue being deemed as found in support of the trial court's judgment, where the plaintiff's attorney had testified without objection that notice had in fact been given as required by the statute.

■■■ In the present case, the trial court did not enter in the judgment an actual damage amount for the tort of interference. Unlike the deemed finding in the *Cielo* case which only required a deemed finding of notice to support the DTPA judgment, there is a need for a specific actual damage figure in the present case, as we have previously discussed, in order for the court to determine if the exemplary award bears a rational relationship to the actual damages in tort. The trial court is not authorized to make findings of fact as to an omitted issue which is not supported by the evidence. *Freedom Homes of Texas, Inc. v. Dickinson*, 598 S.W.2d 714 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *Fidelity & Casualty Co. of New York v. Jefferies*, 545 S.W.2d 881 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.); *Kinnear v. Dixon*, 543 S.W.2d 903 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.).

The record does not contain evidence establishing actual damage to ANPC and Oil Investments caused by TRANSCO's tortious interference with their gas balancing agreement. Without such evidence there cannot be a deemed finding of actual damages. Tex.R.Civ.P. 279. Without such a finding on which exemplary damages can be predicated, we must find that the trial court erred in granting exemplary damages. Because of our ruling on this issue, it is unnecessary to reach TRANSCO's other points of error related to exemplary damages.

## ATTORNEY'S FEES

TRANSCO contends that the court erred in denying its motion for new trial or for a remittitur and motion to modify, correct, or reform the judgment because the award of $1 million in attorney's fees is excessive, lacks the support of legally or factually sufficient evidence and constitutes an abuse of discretion.

The amount of attorney's fees is a question of fact and must be a reasonable amount under the particular circumstances of the case. *Houston Lighting & Power Co. v. Russo Properties*, 710 S.W.2d 711, 715 (Tex.App.—Houston [1st Dist.] 1986, no writ). The term "reasonable attorney's fees," as used in Tex.Civ.Prac. & Rem.Code Ann. § 38.001 (Vernon 1986) [8] for a claim on a written contract, has been construed to mean such fee as a litigant would pay his attorney for prosecuting the case and not a speculative or contingent fee based on uncertainty of the litigation. *Flagg Realtors Inc. v. Harvel*, 509 S.W.2d 885 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.). In the present case, the issue of attorney's fees was decided by the court as factfinder with consent of the parties.

ANPC and Oil Investments called three witnesses who testified that a total of 2,430 hours had been expended by legal staff in prosecution of the suit; that the amount of billable work was $339,246.25; that the case was extremely complex and required highly skilled persons to pursue it; that only a few such persons were qualified to do so; that the benefit of ANPC and Oil Investments from the findings of the jury for the remaining life of the contracts in the Vermilion and Oakvale fields was $11,000,000; and that a reasonable fee in this case for ANPC's and Oil Investments' attorneys would range from $1,250,000 up to $4,000,000.

■■■ Among the factors to be considered by the trial court in determining the amount of attorney's fees to be awarded are the time spent; the nature, difficulties and complexities of the case; the amount of money involved and the client's

8. Formerly Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon 1971).

interest at stake; and the skill and experience needed. *Knopf v. Standard Fixtures Co.*, 581 S.W.2d 504, 507 (Tex.Civ.App.—Dallas 1979, no writ); *see also*, Supreme Court of Texas, Rules Governing the State Bar of Texas art. X, § 9 (Code of Professional Responsibility) DR 2–106 (1973).

■ In the present case, no testimony was offered concerning how much of the time spent by the attorneys was related to the tort action of contractual interference as separated from the breach of contract action. When two or more causes of action are involved, the party seeking to recover attorney's fees must segregate the time spent on a cause for which fees are recoverable and the time spent on a cause for which they may not be recovered. *Bullock v. Kehoe*, 678 S.W.2d 558, 560 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Crow v. Central Soya Co.*, 651 S.W.2d 392, 396 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.).

■ Furthermore, a party is entitled to recover attorney's fees only on the portion of the cause of action in which he prevails. *Kosberg v. Brown*, 601 S.W.2d 414 (Tex.Civ.App.—Houston [14th Dist.] 1980, no writ). In the present case, ANPC and Oil Investments would be entitled to attorney's fees based upon the portion of the suit involving the breach of contract on which they prevailed, but not on the tort action. This would include attorney's fees for the legal work on seeking injunctive relief (on which ANPC and Oil Investments prevailed) to the extent it involved a breach of contract. *Hillhaven, Inc. v. Care One, Inc.*, 620 S.W.2d 788 (Tex.Civ.App.—Fort Worth 1981, writ ref'd n.r.e.). The portion of the judgment awarding attorney's fees must be reversed and remanded for further determination by the court in accordance with this opinion.

### THE PERMANENT INJUNCTION

■ Ordinarily, contractual rights are not enforced by writs of injunction except for matters of specific performance, since an adequate remedy at law is usually available through a suit for damages for breach. 6 L. Lowe, *Remedies, Injunctions and Other Extraordinary Proceedings* § 16 (Texas Practice 2d Ed.1973). Interference by third parties with the performance of contracts may be prevented by injunction where the remedies at law are not adequate. *Stuessy v. Byrd, Davis and Eisenberg*, 381 S.W.2d 126 (Tex.Civ.App.—Austin 1964, no writ).

■ TRANSCO argues that the permanent injunction included within the court's final judgment of July 24, 1987, ordering it to pay the "proper price" for gas taken from appellees is void because it fails to define a "proper price" or to otherwise inform TRANSCO how to arrive at such a price.

Because the parties have contracted for a sole remedy concerning the setting of market-out prices, that portion of the permanent injunction dealing with the proper price is set aside. That is the only portion of the injunction which TRANSCO has challenged, and the remainder of the injunction will remain in effect.

### TRIAL COURT'S POST–JUDGMENT CONTEMPT ORDER

TRANSCO next complains of the court's action on appellees' motion for contempt filed on August 14, 1987, subsequent to the final judgment in this cause. The court ordered TRANSCO to pay $82,355.24 to ANPC and Oil Investments in addition to payment already made for gas taken in June, 1987, under the Vermilion contract and to pay those appellees $4.60 per MMbtu[9] for gas taken in July, 1987.

The order on contempt contains the following language:

> After consideration of Plaintiffs' Motion for Contempt and the evidence[10] and argument of counsel thereon, it is ORDERED that Plaintiffs' Motion for Contempt and request for the imposition of

---

**9.** *MMbtu* is an abbreviation for one million British thermal units, one of the standard units of measurement for natural gas.

**10.** No testimony was taken at the hearing, but five exhibits were offered.

*sanctions is DENIED, save and except that TRANSCO is ORDERED to pay directly to ANPC and OIL [Oil Investments], jointly, the sum of $64,806.48* in addition to the payment previously made by TRANSCO for the June 1987 production under the Vermilion contract. *TRANSCO is further ORDERED to pay* the royalty owners (sic) entitled to receive payments for the June 1987 production under the Vermilion contract, in accordance with its contract obligations and past practices, *the sum of $17,548.76.*

It is further ORDERED that TRANSCO shall pay ANPC and OIL [Oil Investments] for the July 1987 production under the Vermilion contract at the rate of $4.60 per MMbtu for their respective interests in the July 1987 production.

■ While injunctions may be enforced by damage actions or by actions to enforce a penalty within the injunctive order, the customary procedure by which judgments and orders which grant injunctive relief are enforced is a contempt proceeding. *Burlington–Rock Island R. Co. v. Newsom,* 239 S.W.2d 734 (Tex.Civ.App.—Waco 1951, no writ). A damage action is to be distinguished from a contempt proceeding. *See Credit Bureau of Laredo, Inc. v. State,* 515 S.W.2d 706 (Tex.Civ.App.—San Antonio 1974), *aff'd,* 530 S.W.2d 288 (Tex.1975).

■ We do not interpret the trial court's order for TRANSCO to pay sums of money to be sanctions for the civil contempt because the trial court is limited by Section 21.002 of the Government Code to punishing contempt by a fine of up to $500 or confinement in jail for not more than six months, or by both. *See Texas Animal Health Commission v. Nunley,* 647 S.W.2d 951 (Tex.1983). Furthermore, the amounts in the instant case were ordered to be paid to the parties of the lawsuit rather than to the court. It would appear that the trial court is granting additional injunctive relief. The motion for contempt filed on August 14, 1987, and the record of the hearing on that motion shows that this part of the court's contempt order of August 20, 1987, was predicated on the gas price determined by TRANSCO in the exercise of its market-out authority. Such price-related acts are subject to our holding that pricing matters are controlled by the contractual sole remedy provision. We therefore must set aside the court's award of $82,355.24 to ANPC and Oil Investments and its directive that they receive from TRANSCO $4.60 per MMbtu for their respective interests in the July 1987 gas production under the Vermilion contract.

## TRIAL COURT'S POST–JUDGMENT INJUNCTIVE RELIEF

The court's post-judgment order of August 20, 1987, further provided injunctive relief which had also been requested by appellees in their motion filed on August 14, 1987. The court enjoined TRANSCO from litigating in Delaware the propriety of a post-judgment market-out price for gas to be effective August 1, 1987. TRANSCO urges that this was an abuse of discretion by the trial court.

ANPC and Oil Investments counter that because TRANSCO failed to file a timely appeal from the interlocutory temporary injunction, it cannot now complain about any procedural or substantive error committed in granting the injunction. On November 20, 1987, the appellees filed a motion in this Court to dismiss the points of error related to that injunctive relief. The motion has been carried with the case.

■ A temporary injunction is an interlocutory order which is appealable immediately. Tex.Civ.Prac. & Rem.Code Ann. § 51.014(4) (Vernon Supp.1988). Appeals from interlocutory orders shall be accelerated. Tex.R.App.P. 42(a)(1). An appeal bond must be filed within twenty days after the interlocutory order is signed. Tex.R.App.P. 42(a)(3). A Court of Appeals is without jurisdiction to pass upon matters regarding a temporary injunction which does not meet the requirements of the expedited appeal. The time limits imposed by the rules on appeals from interlocutory orders are mandatory and jurisdictional. *Guaranty Bank of Dallas v. O'Dowd,* 595 S.W.2d 634 (Tex.Civ.App.—Waco 1980, writ dism'd), *citing State v. Gibson's Distribut-*

*ing Co.,* 436 S.W.2d 122 (Tex.1968); *Booth v. Amicable Life Insurance Co.,* 143 S.W. 2d 836 (Tex.Civ.App.—Waco 1940, writ dism'd judgmt cor.).

In the instant case, the order temporarily enjoining TRANSCO from litigating the proper price issue in Delaware was signed on August 20, 1987. TRANSCO's bond was due to be filed twenty days after that date, on or before September 9, 1987. No bond was filed by that date. On September 17, 1987, TRANSCO filed a motion to sever that portion of the order enjoining it from prosecuting the Delaware suit, asserting in its motion that it was entitled by right to an accelerated appeal from entry of the temporary injunction. TRANSCO was correct in that assertion, and because it had that right a severance was not required to permit it to make the appeal. However, TRANSCO did not comply with the jurisdictional rules related to accelerated appeals from interlocutory orders. Its bond was finally filed on October 15, 1987, thirty-six days late.

TRANSCO's appeal bond indicates that TRANSCO was appealing from the court's final judgment signed on July 24, 1987, and from the court's injunction order signed on August 20, 1987. That portion of the relief granted regarding TRANSCO's attempt to pursue litigation in Delaware was styled by the court as a temporary injunction.

■ TRANSCO argues that the injunctive relief was neither temporary nor interlocutory. The term *temporary injunction* means an injunction which is effective pending further order of the court. *Conway v. Irick,* 429 S.W.2d 648, 649 (Tex.Civ. App.—Fort Worth 1968, writ ref'd). The fact that the order purports to be temporary is not conclusive. In the case of *Aloe Vera of America, Inc. v. CIC Cosmetics International Corp.,* 517 S.W.2d 433 (Tex. Civ.App.—Dallas 1974, no writ), the court enjoined various acts of interference until a specific calendar date, and the appellate court concluded that the injunction was permanent. The basis of the appellate decision was that the court not only ordered the injunctive relief to a date certain, but also determined that the plaintiff was not entitled to an injunction extending beyond that date. Thus, the order went beyond the scope of a "temporary injunction" and was permanent with respect to the claim for injunctive relief. The rule is more difficult to apply to the present case. The provisions in the post-judgment order of August 20, 1987, that the temporary injunctive relief would remain in effect until all appeals are exhausted and the judgment in this cause becomes final was within the discretion of the trial court. *Trice v. State,* 712 S.W.2d 842, 853 (Tex.App.—Waco 1986, writ ref'd n.r.e.) and the cases there cited. Moreover, the order does not refer to any further proceeding to make the injunction permanent nor does it deny this additional relief. The pleadings requesting the injunction asked for an injunction without any time limitation; thus, an injunction of a permanent nature was sought. Since the trial court only granted a portion of this relief and did not specifically deny the other, we must assume that this injunction was temporary and that the court will later address its permanency.

■ The portion of the order of August 20, 1987, which granted additional sums related to TRANSCO's market-out price setting for June 1987 volumes of gas was not a part of the temporary injunctive relief in the order and was therefore not immediately appealable. The portion of the order granting injunctive relief to ANPC and Oil Investments was appealable under Section 51.014(4) of the Texas Civil Practices & Remedies Code. *See Sobel v. Taylor,* 640 S.W.2d 704, 707 (Tex.App.—Houston [14th Dist.] 1982, no writ) (that portion of the trial court's order regulating protection of documents was not appealable, but the portion granting temporary injunctive relief was appealable); *Jernigan v. Jernigan,* 467 S.W.2d 621, 624–25 (Tex.Civ.App. —Beaumont 1971, writ dism'd) (the court of appeals exercised jurisdiction over that portion of a trial court's order containing interlocutory appealable matters); *Driskill v. Boyd,* 181 S.W. 715, 716 (Tex.Civ.App.— Austin 1915, writ ref'd) (where appellant sought to appeal from an interlocutory order of the court refusing to appoint a re-

ceiver and dissolving a temporary injunction, the appellant had the right to appeal from the injunction and it was immaterial that the judgment also showed that the court refused to appoint a receiver).

■ Because TRANSCO failed to meet the jurisdictional requisites for filing its bond for an appeal of the temporary injunctive relief granted to ANPC and Oil Investments under Texas Rules of Appellate Procedure deadlines, it failed to perfect an appeal from that appealable interlocutory temporary injunction. We are therefore without jurisdiction to address the two points of error raised by TRANSCO regarding the temporary injunctive relief granted in the order of August 20, 1987, and we must grant appellees' motion to overrule TRANSCO's points of error related to that issue for want of jurisdiction.

■ Assuming, arguendo, that TRANSCO preserved the points of error related to the temporary injunction against litigation in Delaware, we have reviewed the points and we find them to be without merit. The Texas Supreme Court has recognized that a Texas court is empowered to issue injunctions to prevent parties from going forward with litigation in sister states in order to protect its jurisdiction. *Christensen v. Integrity Insurance Co.,* 719 S.W.2d 161 (Tex.1986); *Gannon v. Payne,* 706 S.W.2d 304 (Tex.1986).

## APPELLEES' MOTION FOR CONTEMPT IN APPELLATE COURT

■ On November 20, 1987, ANPC and Oil Investments filed a motion for contempt in this Court asking that TRANSCO be held in contempt of the trial court's order of August 20, 1987 for setting in bad faith the market-out prices for gas taken in August and September, 1987, under the Vermilion contract. They urge that this price setting constituted a failure to pay the "proper price" for the gas taken as they had been enjoined by the trial court to do. The motion has been carried with the case.

The allegedly contemptuous acts attributed to TRANSCO in the motion are price-related and are therefore subject to our holding that pricing matters under the Vermilion contract are controlled by the sole remedy provision of the contract. Accordingly, we overrule the motion for contempt filed in this Court.

## APPELLEES' CROSS–POINTS

In two cross-points, ANPC and Oil Investments urge that the trial court erred (1) in granting TRANSCO a recovery of certain volumes of gas, because such relief was not pleaded for; alternatively, that the gas had already been tendered and refused by TRANSCO; and (2) in allowing TRANSCO recovery of attorney's fees on its counterclaim because TRANSCO failed to establish a breach of contract.

■ TRANSCO argues in a supplementary brief that appellees did not raise these points below and that they therefore waived them for appeal, citing *Dyer v. A–1 Automotive, Inc.,* 743 S.W.2d 685, 687 (Tex.App.—El Paso 1987, no writ). Absent fundamental error, a party cannot raise an issue on appeal if the issue was not raised in the party's pleadings or during trial. *Stafford v. Stafford,* 726 S.W.2d 14, 15 (Tex.1987). ANPC and Oil Investments have not responded to this assertion by TRANSCO, and we have not located any point in the record where the issues were raised. Accordingly, these cross-points were not preserved for appeal and are therefore overruled.

## CONCLUSION

We reform the judgment in the following manner:

(a) by deleting the $16,000,000 awarded in exemplary damages to ANPC and Oil Investments, because no actual damages on the tortious interference claim were found;

(b) by deleting the damages awarded by the court under Special Issue 2(c) in the amount of $2,376,609, because the award was for contractual damages related to gas price determinations for which the contract provided a sole remedy other than money damages;

(c) by restoring the jury findings of $348,211 under Special Issue 2(a) for the amount of loss for TRANSCO's failure to purchase the required monthly quantities of gas and $352,875 under Special Issue 2(b) for TRANSCO's failure to take-or-pay for the required annual minimum quantities of gas (in lieu of the amount awarded by the court on the judgment n.o.v.).

(d) by deleting from the trial court's contempt order of August 20, 1987, the award of $82,355.24 to ANPC and Oil Investments and that part which provided for ANPC and Oil Investments to receive $4.60 per MMbtu from TRANSCO for their respective interests in the July 1987 production under the Vermilion contracts. These matters are price-related and are subject to the sole remedy provision of the Vermilion contract.

We dismiss those portions of TRANSCO's appeal related to the temporary injunction order signed on August 20, 1987, because these cross-points were not properly preserved on appeal.

We sever the portion of the judgment related to the award of attorney's fees from the remainder of the cause of action. This severed portion is remanded to the trial court for a rehearing in accordance with this opinion. All matters in the permanent injunction that deal with the setting of proper gas prices are deleted because these price-related matters are controlled by the sole remedy provision of the Vermilion contract.

As modified, the judgment of the trial court is affirmed except for the severed portion which is remanded for a rehearing.