**AMERICAN NATIONAL PETROLEUM COMPANY and Oil Investments, Ltd., Petitioners,**

v.

**TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Respondent.**

No. C–8350.

Supreme Court of Texas.

Oct. 10, 1990.

Rehearing Overruled Nov. 28, 1990.

James R. Leahy, Houston, William W. Kilgarlin, Austin, for petitioners.

Murray Fogler, Jay W. Elston, Houston, William V. Dorsaneo, III, Dallas, Mark G. Yudof, Douglas Laycock, Austin, for respondent.

## OPINION

RAY, Justice.

This is a breach of contract and tortious interference with contract case. Trial was to a jury, which found that Transcontinental Gas Pipe Line Company (Transco) breached its "take or pay" contracts with American National Petroleum Company (ANPC) and Oil Investments, Ltd. (Oil), and tortiously interfered with gas balancing agreements ANPC and Oil had with third parties. The jury found exemplary damages of $16 million for the tortious interference, and the trial court rendered judgment for ANPC and Oil on both theories, including the exemplary damages. The court of appeals, with other judgment modifications, reversed the judgment for exemplary damages, holding, in part, that ANPC and Oil's failure to obtain a separate finding of tort damages precluded recovery of the exemplary damages. 763 S.W.2d 809. We hold that Transco's express statement that it did not object to the failure to submit a

tort damages jury question because the damages for tort and contract were the same, was sufficient to waive any error in the failure to submit a separate tort damages question. We reverse the judgment of the court of appeals and remand the cause to that court for it to consider points not previously addressed, including factual sufficiency points.

ANPC and Oil are independent producers who own working interests in two gas wells in the Vermilion field in the Gulf of Mexico. ANPC also owns a working interest in five gas wells in the Oakvale field in Mississippi. Transco buys gas from ANPC and Oil, and is in fact the only pipeline company servicing the Vermilion field. Both the Vermilion contract and the Oakvale contract obligated Transco to take-or-pay for specified annual and monthly percentages of ANPC's and Oil's gas delivery capacity. ANPC and Oil granted Transco the exclusive contract rights to their gas.

ANPC and Oil entered into an operating agreement with Samedan Oil Corporation and the other working interest owners in the Vermilion field. Samedan was designated as the gas operator for the field. Under the operating agreement, if a particular owner's working interest was underproduced and another owner's interest was overproduced, the underproduced owner could ask Samedan to bring it back into balance with the other working interest owners by reallocating an appropriate amount of the sales proceeds from gas taken by Transco. Samedan received monthly a notice of how much gas Transco intended to buy. Samedan would then instruct Transco on how to allocate the payments to the various working interest owners in accordance with their fractional interests and with due regard for the under-balanced/overbalanced situation.[1]

1. Such gas balancing agreements are common. A gas balancing agreement is a contract executed by the various mineral interest owners of a gas well or field or similar tract in which the mineral estate is owned in co-tenancy setting forth the manner in which production from the well, field or tract will be balanced among the owners in the event that one owner sells more of the gas stream from the well or tract than the

other owners. Imbalances inevitably occur when a buyer takes gas from a well or tract which is also owned in part by others than his seller. With the growth of "spot" market selling, gas balancing agreements are of increasing complexity and importance to attempt to balance sales proceeds with other producers draining the same reservoir. Johnson, *Recent Developments in Natural Gas Sales and Transporta-*

ANPC entered into a similar operating agreement and gas balancing agreement for the Oakvale field. APC Operating Partnerships, known as "Apache," was the designated gas operator for the Oakvale field.

In the early 1980s a surplus of deliverable natural gas created a financial crisis for Transco. In 1983, at Transco's request, the Vermilion contract was modified to reduce Transco's annual take-or-pay percentage obligation and to add a "market-out" clause.[2] The "market-out" clause permitted Transco to reduce the contract price to be paid ANPC and Oil for their gas when, in Transco's "sole opinion," the existing contract price would render the gas "uneconomic" to Transco or its customers. The amended Vermilion contract provided that, if ANPC and Oil were dissatisfied with a market-out price established by Transco, their sole remedy was to request that Transco release all of their gas obligations. This remedy could be exercised if ANPC and Oil had another buyer willing to pay a gas price higher than that set by Transco as the new market-out price. The Oakvale contract was modified in 1984 to delete Transco's take-or-pay obligation in its entirety and to substitute a provision that required Transco to take ANPC's gas production ratably with other producers in the Oakvale field.

By 1985 gas prices had dropped dramatically. Transco engaged in a course of action to reduce its obligations to take higher-priced gas under contracts such as the Vermilion and Oakvale contracts. Transco developed an "omnibus agreement" under which gas producers waived any outstanding liability claims against Transco and agreed to a lower price and reduced purchase obligations. To pressure producers into signing the omnibus agreement, Transco adopted a policy of taking only 3% of the gas capacity of each non-signing producer regardless of take-or-pay or other minimum take provisions in its contracts. The policy was discriminatory against non-signers. A Transco officer admitted that the company took more than 3% from producers who signed the omnibus agreement. The Transco officer further testified that the objective of the 3% policy was to put financial pressure on the non-signers to force them to sign.

Transco elected to establish its market-out price on the market price for "spot" gas, which is gas not dedicated to a specific buyer sold on a short term, interruptible basis. It was less expensive than the "system" gas sold under the long-term dedicated and uninterruptible contracts between Transco and its producers such as ANPC and Oil. Transco thus set its market-out price below the prevailing price for comparably situated gas. To justify this policy, Transco asserted that federal regulations required it to buy gas at the lowest price available, which it construed to be the "spot" gas price.

Transco applied its 3% policy to ANPC's and Oil's gas in both the Vermilion and Oakvale fields, although ANPC and Oil of-

*tion Contracts—Chapter I,* 1989 STATE BAR OF TEXAS ADVANCED OIL, GAS & MINERAL LAW COURSE at 19. An interest owner's being out of balance is also a substantial problem for the operator. Gas produced from each well is theoretically owned in proportion to percentage ownership of the cotenants. Since large quantities of gas cannot be economically or prudently stored for long periods of time, a gas operator must have some method to deal with the under-balanced owner's share of the gas. The 1989 revision of the Model Form Operating Agreement of the American Association of Petroleum Landmen (A.A.P.L.) differs substantially from the 1982 version by providing additional rights in the operator to purchase or sell another party's share of production when there is no gas balancing agreement among the parties. Pendleton, *A Comparison of the 1989 A.A.P.L. Model Form Operating Agreement with the 1982 Model Form Operating Agreement,* 1990 STATE BAR OF TEXAS OIL, GAS, AND MINERAL LAW FOR LAWYERS AND LEGAL ASSISTANTS INSTITUTE, at G18. The 1989 Model Agreement, like the 1982 version and its predecessors, has two options—one incorporating by reference the gas balancing agreement of the interest owners in the "Contract Area," and the other for use when there is no gas balancing agreement. *Id.* at G42–G43.

2. "Market-out" clauses allow the purchaser to reduce the price it pays whenever it determines that the market into which it sells will not bear the currently-demanded price. R. Hemingway, *The Law of Oil and Gas* § 7.4 (2d ed. 1983).

fered all of their reserves to Transco. Moreover, Transco set the Oakvale contract gas price for ANPC using a market-out method, even though the Oakvale contract had no such provision. A Transco officer testified that the company used the market-out price policy to pressure producers who refused to sign the proposed omnibus agreement without regard to whether Transco had a contractual or other right to reduce the prices. The Transco officer further admitted that Transco paid more to the settling producers for their gas from the same field than it did for the gas purchased from ANPC and Oil and other "non-settling producers" who refused to waive their liability claims or to sign the omnibus agreement.

As a result of the 3% policy, Transco did not take the monthly minimum required volumes of ANPC's and Oil's production capacity from November 1985 through July 1986, nor the contract annual minimum for the fiscal year ended June 30, 1986. As another result of its 3% policy, ANPC and Oil became underbalanced in the Vermilion field. The 3% policy also caused ANPC to become underbalanced in the Oakvale field because that contract called for Transco to take the gas ratably among all producers.

In November 1986 ANPC and Oil requested their gas operators, Samedan and Apache, to bring them back into balance in the Vermilion and Oakvale fields, respectively. Copies of the requests were forwarded to Transco, which responded in December. A Transco vice president wrote ANPC and Oil, with copies to the respective operators, that until ANPC (respectively Oil) agreed to the omnibus agreement Transco refused to reallocate payments for future production to bring ANPC (respectively Oil) back into balance. The same vice president testified at trial as to the meaning of the letter:

Q. Then likewise you sent the same letter to Samedan so they would know the same thing, I guess, is that correct, sir?

A. That's correct.

Q. All right.

What you were trying to get to Samedan was to the effect the purpose of the letter is to tell Samedan was until we settle with ANPC we are not going to take gas in accordance with your allocation. We are not going to pay you for the gas that way.

A. That's correct.

\* \* \* \* \* \*

Q. And what you were trying to tell Samedan and Apache that if you do that [ask that ANPC and Oil be brought back into balance] we will not buy any gas. That was the purpose of your letter, wasn't it?

A. I believe that is right.

In context, the jury was entitled to conclude from this testimony that at the very least Transco would refuse to take even the 3%, thus putting ANPC and Oil further out of balance with the other interest owners serviced by the operator. The context of the testimony also admits of the interpretation that Transco threatened not to take any gas from the wells operated by Samedan (or Apache) in which ANPC or Oil was an interest owner. Thereafter both operators told ANPC and Oil that "their hands were tied" and that "they couldn't do any thing about" enforcing the provisions of the gas balancing agreements with other producers in the Vermilion and Oakvale fields.

Transco further admitted that in order to bring ANPC and Oil back into balance, Transco would not have had to take any additional gas. It would merely have had to reallocate payments for gas already taken. Further, the reallocation requested through the operators would have permitted Transco to pay *less* for the gas taken because of other transactions affecting Transco's purchasing prices at that time.

In addition to breach of contract and bad faith findings, the jury found that Transco tortiously interfered with the gas balancing agreements among ANPC, Oil and their co-interest owners in the Vermilion and Oakvale fields; that such interference was without legal justification or excuse; that such interference proximately caused damages to ANPC and Oil; and that Transco

acted with malice in committing its actions of tortious interference. The jury further found that $16,000,000 should be awarded against Transco to ANPC and Oil as exemplary damages. There was no separate finding of tort damages for the interference. In objecting to the cluster of jury questions relating to the tortious interference theory of recovery, counsel for Transco stated:

We object to the submission of Special Issue No. 5 and 6 and 7 on the interference for the same reason, that is because of any actual damages which they may have sustained are the same as the Vermilion take or pay claim and the minimum take claim and the submission of those issues are unnecessary.

Just to be clear we are not objecting to the failure of the plaintiff to submit a damage issue in connection with Special Issues 5, 6 and 7 on the interference claim for the same reason we stated earlier in that we agree in the damages which would be recoverable from the defendant in an affirmative finding are the same as the damages recoverable for the Vermilion take or pay claim and the minimum pay claim and the Oak Vale claim.

■ Without citing any authority, the court of appeals concluded that such "remarks of TRANSCO's counsel constitute neither a judicial admission nor a stipulation which dispensed with the requirement for the submission of an issue to the jury regarding the amount of actual tort damages." 763 S.W.2d at 821. Such conclusion was error. The trial court was entitled to rely on the statement and to find damages for the tort cause of action the same as for the contract cause of action that was submitted to the jury. A cluster of jury questions on tortious interference with contract was submitted to the jury. Transco's failure to object to the omission of a tort damages question as part of that cluster alone waived the requirement of submitting the correct damages issue to the jury. Tex.R.Civ.P. 279; *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex.1982); *Transport Ins. Co. v. Mabra*, 487 S.W.2d 704, 707–708 (Tex.1972). Transco went further by stat-

ing that the reason there was no objection was that it agreed damages recoverable for affirmative findings on the tort liability theory are the same as the damages question asked under the contract theory. The trial court may hold a party to its position. *See Johnson v. Swain*, 787 S.W.2d 36, 39 (Tex.1989). On appeal Transco is bound by a deemed finding of actual tort damages by the trial court if there is any evidence of damages from the tortious interference. Tex.R.Civ.P. 279; *Roark v. Allen*, 633 S.W.2d 804, 808–809 (Tex.1982); *Kirk v. Standard Life & Acc. Ins. Co.*, 475 S.W.2d 570, 572 (Tex.1972).

The court of appeals alternatively held there was no evidence of the extent of damages for tortious interference with contract. We must review the record to determine if there is any evidence from which the trial court could have found an amount (however minimal) of actual damages for tortious interference with contract, under the measure of actual damages for that tort.

■ In a commercial relations tort, the fact that the damages are "economic" does not mean that they may not be damages for the tort. The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed. *See Capital Title Co. v. Donaldson*, 739 S.W.2d 384, 391 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Prowse v. Whitehurst*, 313 S.W.2d 126, 130–31 (Tex.Civ.App.—San Antonio 1957, writ ref'd n.r.e.).

Had Transco permitted the reallocation of the payments for the gas actually taken, *i.e.*, had Transco not interfered with the gas balancing agreements, the amount Transco would have paid ANPC and Oil would not necessarily have been the amount Transco should have paid ANPC and Oil under its direct contracts with those parties. Transco was paying ANPC and Oil a price rate based on the market

price for "spot" gas, and the jury apparently found that to be an improper price under the contract. The gas balancing agreement with the operators and among the interest owners only dealt with how the relative amounts of gas actually taken would be allocated to the interest owners, not the price the pipeline company was paying that interest owner for the gas.

Thus in at least this one respect, the damages for the contract interfered with (the gas balancing agreement) could and apparently did differ from the total damages for Transco's breach of contract. The jury and trial court determined that Transco was paying at a rate too low under its contracts with ANPC and Oil. The responsibilities of the co-interest owners under the gas balancing agreement would not have included the underpayment amount, which was strictly a matter between Transco and ANPC (respectively, Oil). The tortious interference with contract actual damages would have differed by at least that amount.

Nevertheless, there was evidence of the rate Transco was paying ANPC and Oil sufficient for the jury or trial court to have found actual damages for the breach of the gas balancing agreement, which would have been an element of actual damages for the tortious interference claim against Transco, had Transco not waived the requirement of such a finding. Since there was some evidence to support a deemed or implied finding, the court of appeals should have upheld the judgment for tort recovery, subject to review for factual sufficiency of the evidence.

■■■ Transco further argues it established it was privileged to interfere with the gas balancing agreements. Privilege to interfere with a contract is an affirmative defense on which Transco had the burden of persuasion. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). The jury expressly found the interference was without legal justification or excuse. Transco's arguments that it was privileged to interfere amount to the assertion that an act that is a breach of a direct contract can never also be tortious interference with a

different contract. That is not the law. Transco breached its contract to coerce ANPC and Oil to settle outstanding liability claims. Trying to coerce a party into a favorable settlement by threats under existing or potential future contracts with third parties is *not* privileged. *Griffin v. Palatine Ins. Co.,* 235 S.W. 202, 204, *modified on rehearing on other grounds,* 238 S.W. 637 (Tex.Comm'n App.1922, judgmt adopted). The evidence construed favorably to support the jury verdict was that Transco threatened the gas operators (and through them the other interest owners) that if those third parties insisted on performance of their gas balancing agreement with ANPC and Oil, then Transco would breach its own contracts with those third parties to their economic detriment. Such a threat may constitute tortious interference with contract. *Sterner v. Marathon Oil Co.,* 767 S.W.2d at 691. A knowing and intentional breach of one's direct contract may also be an act tortiously interfering with a third party's contract, if it is done with a purpose and effect of preventing the third party from performing its contract with another. *See generally, Black Lake Pipe Line Co. v. Union Construction Co.,* 538 S.W.2d 80, 91 (Tex. 1976); *Raymond v. Yarrington,* 96 Tex. 443, 452, 73 S.W. 800, 804 (1903); *Armendariz v. Mora,* 553 S.W.2d 400, 405 (Tex. Civ.App.—El Paso 1977, writ ref'd n.r.e.). There was evidence that Transco knew its actions were a breach of its contracts with ANPC and Oil and would cause the operators to breach the balancing agreements, and that Transco purposefully engaged in that course of action to put economic pressure on ANPC and Oil to settle the outstanding liability claims they had against Transco. There was some evidence from which the jury could conclude the conduct was *not* privileged, and thus Transco's claim of privilege was not established as a matter of law.

In light of our holding on actual tort damages, we need not reach ANPC's alternative theory that a tort duty of good faith and fair dealing should be implied in a gas pipeline contract. Our holding requires us,

however, to make some mention of ANPC's attorney fee points.

The court of appeals held that the failure to segregate attorney time spent prosecuting the breach of contract claim (which that court affirmed as modified) and the tortious interference with contract claim (which the court reversed and rendered), required a reversal and remand of the amount of attorneys' fees. Since we have held that the court of appeals erred in overturning the tort ground of recovery on the reasons it stated, recovery of attorneys' fees for the tortious interference theory need not be deleted. Because there are factual sufficiency points, some of which are related to the attorneys' fees, all of which are subject to the jurisdiction of the court of appeals, we will remand the whole case. The court of appeals may not reverse and *render* judgment denying attorney's fees for the tortious interference claim. We reverse the judgment of the court of appeals and remand the cause for further proceedings consistent with this opinion.

GONZALEZ, J., dissents, joined by COOK, J.

GONZALEZ, Justice, dissenting.

I do not agree with the court that Transco, with full knowledge of all material facts, intentionally or voluntarily relinquished a known right. It boggles my mind that the court concludes that Transco at the charge conference, renounced, repudiated, abandoned, or surrendered their claim that there was no evidence of a separate tort for which punitive damages could be awarded.[1]

I also disagree with the construction that the court has given to the purported "stipulation." The court has taken charge objections out of context and has given them an interpretation that was never intended by the parties. By concluding that damages were stipulated, and that there might be different dollar amounts for contract and tort claims, the court also avoids the problem that exemplary damages may not be awarded without proof of a tort, separate and independent from the breach of contract, with actual damages.

A review of the facts will help put the objections to the charge in context. Transcontinental Gas Pipe Line Corporation ("Transco") entered into a contract with American National Petroleum Company and Oil Investments Ltd. ("ANPC" and "OIL") whereby Transco would take or pay for specific percentages of ANPC's gas production capacity.

Some time thereafter, the market price of gas fell, and Transco began a series of attempts to renegotiate its contracts with various gas suppliers. ANPC and OIL agreed to modify their agreements, in one contract providing for a sole remedy in the event of a breach, and in the other replacing the take or pay obligation with a duty to ratably take. The market continued to decline and Transco proposed a new contract to all producers. Concurrently it began accepting only 3% of the capacity of producers who would not waive various contractual rights it might have against Transco. Transco also paid a higher price for gas bought from producers who agreed to the new contractual terms.

ANPC and OIL refused to waive any of their rights under their contract with Transco, and attempted to counter the 3% program by prevailing on their fellow interest owners to allow ANPC and OIL to sell more of their gas so as to bring them back into balance under balancing agreements between the interest owners and operators of the two fields. When the operators indicated their intent to honor the balancing agreements, Transco threatened to refuse acceptance of any ANPC or OIL gas.

---

1. When writ was granted the primary question in this case was whether the *Arnold v. Nat'l County Mutual Fire Co.,* 725 S.W.2d 165 (Tex. 1987), duty in tort of good faith and fair dealing is applicable to a "take or pay" oil and gas case. Rather than resolving the issue, my colleagues have chosen an easy (and in my opinion an erroneous) way out. This important issue will not go away. Postponing its resolution will only add to the burdens of litigation and continue to clog our dockets with these types of claims. We owe it to the bench, bar and affected parties to address the question. I would do so.

ANPC and OIL brought suit against Transco alleging damages for breach of contract, breach of the implied covenant of good faith and fair dealing and tortious interference with contractual relations. ANPC and OIL sought both actual and punitive damages as well as injunctive relief. Transco countersued for payments made to ANPC for gas it never delivered.

The trial court awarded judgment non obstante veredicto to ANPC and OIL in the approximate amount of $4.7 million in actual damages, $16 million in punitive damages, $1 million in attorneys' fees, and injunctive relief. The court of appeals modified judgment by deleting the award of punitive damages because no independent tort or tort damages was shown.

ANPC and OIL have not and cannot claim surprise at Transco's argument that contract damages cannot be the basis for an award based on tort. Transco moved for summary judgment on the basis that a tort separate and independent of the contract had not been pleaded.

In the conference on objections to the court's charge, Transco objected to issues two, three and four relating to damages from its failure to perform certain contract duties in good faith, because Transco had stipulated to contract damages in the event of an affirmative finding, and the damages for breach of a general duty of good faith would be the same. Transco then objected to the submission of the tortious interference claim by stating:

> We object to the submission of Special Issue *No. 5 and 6 and 7* for the same reason, that is because of any actual damages which they may have sustained are the same as the Vermilion take or pay claim and the minimum take claim and the submission of those issues are unnecessary.
>
> Just to be clear we are not objecting to the failure of the plaintiff to submit a damage issue in connection with Special Issues 5, 6 and 7 on the interference

claim for the same reason we stated earlier in that we agree in the damages which would be recoverable from the defendant in an affirmative finding are the same as the damages recoverable for the Vermilion take or pay claim and the minimum pay claim and the Oak Vale claim.

(Emphasis added.) Transco did not in any way agree that the tortious interference issues could be submitted and then damages would be stipulated. To the contrary it objected to *all* issues relating to tortious interference because the only damages would be contract damages.

Transco's statement is no more than a remark about the state of the evidence on damages, not a "stipulation" of damages for tortious interference. Before we try to give effect to the statements of counsel, we must interpret them in light of the circumstances in which they were made, including the allegations in the pleadings and the attitude of the parties with respect to the issues. *Mann v. Fender*, 587 S.W.2d 188, 202 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.). We should not give them a greater effect than intended. *Austin v. Austin*, 603 S.W.2d 204, 207 (Tex.1980). If a purported stipulation is not clear or is ambiguous it should be disregarded. *Sergeant v. Goldsmith Dry Goods Co.*, 110 Tex. 482, 221 S.W. 259, 261 (1920). Transco's objection could have been more precisely stated, but the only reasonable interpretation of this objection is the argument Transco made at every level, *that there can be no exemplary damages when the only injury is the failure to receive the economic benefit of a contract with the defendant caused by the defendant's breach.*

Transco expressly said that it did not object to the omission of a tort damage issue. The court concludes that Transco is bound by the rule of deemed findings of Tex.R.Civ.P. 279, if there is sufficient evidence to support an issue omitted without objection.[2] The court concludes that there

---

2. The court relies on *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 165 (Tex.1982) and *Transport Insurance Co. v. Mabra*, 487 S.W.2d 704, 707–08 (Tex.1972) as support for its contention that Transco's failure to

object to the omission of a tort damages issue waived requirement of submitting a correct issue to the jury. However, this reliance is misplaced because both these cases state that the issue will only be deemed if there is evidence to

is some evidence to support the omitted issue because the record shows that the damages for tortious interference are different from the "total damages for Transco's breach of contract." This conclusion, however, runs directly contrary to ANPC's and OIL's own assertions. In their application for writ of error, ANPC and OIL stated:

> Under either a breach of contract or tortious interference claim in this case, the actual damages of ANPC and OIL would not be more than the volumes of gas taken, or which should have been taken, multiplied by a properly determined contract price.
>
> *       *       *       *       *       *
>
> It is axiomatic, and the evidence clearly indicates, *that the amount of money received by ANPC and OIL would not have differed whether Samedan and Apache* [the operators responsible for administering the operating agreements] *had been allowed to honor their balancing agreements, or Transco had taken or paid according to its contracts.*

(Emphasis added.) Why is the court so willing to stretch one statement by Transco during trial while at the same time it ignores this judicial admission of ANPC and OIL?

The court has concluded that there are different damages for the tort and breach of contract because Transco could have honored the balancing agreements and still been in violation of its own contract with the plaintiffs. The argument seems to be that (1) Transco did not pay enough for the little gas that it purchased, (2) did not purchase the amount of gas it would have if the balancing agreements had been honored, and (3) did not purchase as much as it should have under the contracts between plaintiffs and defendant. In each case the damage is the profit ANPC and OIL hoped to make from their contracts with Transco. The distinction is no more than the degree of damage caused by Transco's breach of contract. Simply calling one amount tort and the other breach of contract misses the point of Transco's argument: that the nature of the injury shows whether the cause of action truly sounds in tort, or whether it is merely a breach of contract cast in tortious terms.

We held in *Amoco Production Co. v. Alexander,* 622 S.W.2d 563, 571 (Tex.1981) that a breach of contract, even if malicious, intentional or capricious, will not support exemplary damages unless a *distinct* tort is alleged and proved. Merely including a claim of tort with a contract action does not allow for an award of exemplary damages unless it is proved that the distinct, willful tort caused actual damages. *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986).[3]

The question is whether a *tort* distinct from breach of contract has been alleged when a single act, causing a single injury, is alleged to be both a tort and a breach of contract. We answered that question in *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986). In that case it was alleged that the defendant was grossly negligent in the construction of a house, and breached the warranty of good workmanship. We held:

> The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. [Citations omitted.] The Reeds' injury was that the house they were promised and paid for was not the house they received. This can only be characterized as a breach of contract, and breach of contract cannot support recovery of exemplary damages.
>
> *       *       *       *       *       *
>
> To support an award of exemplary damages in this case, the plaintiff must

---

support the finding. Here, there is no evidence of injury in tort, separate from breach of contract damages.

**3.** We disallowed a recovery for tortious interference in *Bellefonte* because no finding for damages from any tort were obtained. 704 S.W.2d at 745.

prove a *distinct tortious injury* with actual damages.

*Id.* at 618 (emphasis added). We observed that although mental anguish was pleaded, no issue was submitted for damages other than benefit of the bargain, and reversed the award of exemplary damages. *Id.*[4]

The common-law distinction between damages available for tort and contract are not new. For example, whether a purchaser may sue for breach of warranty or strict liability for a defective product depends on whether the product merely did not perform as promised (contract) or whether it caused physical harm to person or property (tort). *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 79 (Tex.1977). Also, parties suing for fraudulent inducement may receive the difference between the value of what they parted with and what they received, but not the hoped-for benefit of the bargain. *Morriss–Buick Co. v. Pondrom*, 131 Tex. 98, 113 S.W.2d 889 (1938). On the other hand, they may sue for breach of contract and receive the benefit of their bargain.

Thus we must examine what ANPC and OIL lost and what they might have received had the gas balancing agreements been fully performed. Each working interest owner separately contracts to sell gas to Transco. Pursuant to the operating agreement between the interest owners and the operator, all of the owners designated the operator of the field to be his agent in dealing with the purchaser. The operator determines the volume of gas each owner gets to sell to Transco in any given month. For various reasons the amount designated by the operator in each month may not match the owner's true mineral interest.[5] The gas balancing agreement is designed merely to assist the operator to insure that all of the individual interest owners eventually get to sell their own full share of the gas. Transco is not a party to these agreements. The gas balancing agreement does not alter the fact that the owners sell their gas pursuant to their own contract with the buyer. Consequently the sole benefit to be gained from the gas balancing agreements is the right to sell gas to Transco pursuant to the gas supply agreement between ANPC, OIL, and Transco.

Under the court's theory, the only way for Transco to avoid interfering with the balancing agreement is to purchase gas from ANPC and OIL. The plaintiffs lost no sales to other parties, and suffered no loss of property or physical injury. They cannot receive both their actual damages in contract and their actual damages in tort without receiving a double recovery.[6] It is clear, then, that the only damages ANPC and OIL suffered because of the claimed interference with the balancing agreement is the loss of the right to sell to Transco, and these damages are the same as for Transco's breach of the gas supply contract. Having failed to show any injury that is not simply breach of contract,

---

**4.** *See also International Bank, N.A. v. Morales,* 736 S.W.2d 622 (Tex.1987); *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986).

Other courts have come to the same conclusion. They have held that even if all other elements of a tort have been proven, the failure to show damages other than the loss of the benefit of the bargain between the parties precludes a recovery for exemplary damages. *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 485 (Tex.App.—Corpus Christi 1989, writ denied) (no cause of action for negligence where only injury is economic losses under distributorship contract between parties); *Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 156 (Tex.App.—Texarkana 1988, writ denied) (exemplary damages may not be awarded for fraud when the only evidence of injury is loss of benefit of the bargain between employer and employee); *Hebisen v. Nassau Development Co.,* 754 S.W.2d 345, 348 (Tex.App.—Houston [14th] 1988, writ denied) (no exemplary damages for fraud where only injury is economic loss under lease agreement between parties).

**5.** For a discussion of the various reasons that an interest may be overproduced or underproduced, see Note, "Oil and Gas: Production Imbalance in Split Stream Gas Wells—Getting Your Fair Share," 30 Okla.L.Rev. 955, 960–64 (1977).

**6.** If it appears a tort claim is only an alternate theory and a court could not properly enter judgment for compensatory damages on both the contract and tort theories without granting double recovery, an award of exemplary damages is improper. *See generally* 22 Am.Jur.2d *Damages* § 752 at 810 (1988).

ANPC and OIL are not entitled to exemplary damages.

The unfortunate lesson to be learned from today's opinion is that one should never "agree" to anything in open court for fear that an imperfect choice of words will be given an interpretation far beyond what was intended. The court has taken one passage out of context and concluded that Transco stipulated actual damages which would support punitive damages in the event of a finding of the other elements of tortious interference. In context it is clear that Transco was making the very argument it has made at every level in this case, that there can be no tort when the only damage is the benefit of the bargain with the defendant. Transco objected to the entire submission of all the tort issues for that very reason. In this case there has been no injury other than the loss of profit that the plaintiffs should have made from their contract with the defendant. Without a tort injury, the plaintiffs have nothing but a breach of contract cause of action dressed up in the trappings of tort.

For the above reasons, I dissent.

COOK, J., joins this opinion.