**Opinion issued July 24, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00501-CV

———————————

**MSMTBR, INC. AND RUSSELL DAVID BALUSEK, Appellants**

**V.**

**MID-ATLANTIC FINANCE CO., INC., Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-30123**

---

## MEMORANDUM OPINION ON REHEARING

Appellee, Mid-Atlantic Finance Co., Inc. ("Mid-Atlantic"), has filed a

motion for rehearing of our March 11, 2014 opinion and judgment. We deny the

motion for rehearing, but withdraw our opinion and judgment of March 11, 2014 and issue the following opinion and a new judgment in their stead.

Appellants, MSMTBR, Inc. and Russell David Balusek (collectively, "MSMTBR"), challenge the trial court's rendition of summary judgment in favor of Mid-Atlantic in its suit against MSMTBR for conversion and recovery under the Texas Theft Liability Act ("TLA").[1]  In three issues, MSMTBR contends that the trial court erred in granting Mid-Atlantic summary judgment on its conversion and TLA claims.

We reverse and remand.

## Background

On October 30, 2009, Mid-Atlantic, a finance company in the business of purchasing installment sales contracts from automobile dealers, entered into a Flex Line Program Agreement (the "Agreement") with MSMTBR to purchase certain automobile installment sales contracts.  Pursuant to the Agreement, MSMTBR, after executing an automobile installment sales contract with a customer, would present the contract to Mid-Atlantic for consideration.  If Mid-Atlantic approved the contract, MSMTBR and Mid-Atlantic would then agree to a purchase price, through a "Decision Callback," and Mid-Atlantic would buy the contract.  Mid-Atlantic would make an initial cash advance to MSMTBR and then make

---

[1]     *See* Tex. Civ. Prac. & Rem. Code Ann.  §§ 134.001–.005 (Vernon 2011).

2

additional payments to MSMTBR as the consumer performed on the installment sales contract. If the consumer defaulted on the contract within six months, Mid-Atlantic could recover its losses by repossessing and selling the automobiles or demanding that MSMTBR repurchase the installment sales contract. If the consumer defaulted on the contract after the sixth month, the Agreement provided for a "Bonus Pool" to be "used to satisfy expenses" and "deficiency balances" at Mid-Atlantic's "discretion."

Once Mid-Atlantic purchased an installment sales contract, "all rights under the Contract immediately transferred to Mid-Atlantic," and it became the "lawful owner thereof, free and clear of all claims, liens or encumbrances whatsoever." And after the transaction was processed by the Texas Department of Motor Vehicles ("DMV"), MSMTBR was obligated to deliver the original title to Mid-Atlantic to "hold" the title.

In connection with the Agreement, MSMTBR also granted Mid-Atlantic a "Limited Power of Attorney," authorizing Mid-Atlantic as

> our true and lawful attorneys for us and in our names, place and stead, and for our use and benefit, to ask, demand, sue for, recover, collect and receive all sums of money, debts, due accounts, interest, and demands whatsoever as are now or shall hereafter become due, owing, payable or belonging to [MSMTBR] solely with respect to the Contracts specifically set forth in Schedule A.

And it further authorized Mid-Atlantic to

have, use and take all lawful ways and means in [MSMTBR's name] or otherwise for the recovery thereon, by attachment, distress or otherwise, and to compromise and agree for the same, and in [MSMTBR's] name[] to make, seal and deliver all instruments necessary for said premises: to bargain, contract for, agree, receive and take possession of all security . . . .

In its original petition, Mid-Atlantic alleged that after it had purchased eighty-two automobile installment sales contracts under the Agreement and was holding titles to the automobiles to protect its security interests, MSMTBR applied for and received substitute titles to fifty-one of the automobiles. In regard to some of the automobiles, MSMTBR "converted the collateral for its own benefit and use by repossessing the collateral and reselling it." On one contract, MSMTBR collected "insurance proceeds from a casualty loss of the collateral." Mid-Atlantic demanded return of the titles, but MSMTBR refused. Mid-Atlantic further alleged that, upon its purchase of the installment sales contracts at issue, it became "the legal owner . . . together with all rights under the[] Contracts, including the right to receive payments, the right to hold title, the right to be designated the lienholder on the title, and all rights to any collateral securing payment under the Contracts." At the time it filed suit, Mid-Atlantic had purchased the eighty-two contracts for an agreed price of $364,498.27, of which $234,526.94 was "paid immediately, with the balance becoming due if the underlying Contracts performed for an agreed-upon period."

4

Mid-Atlantic sought damages from MSMTBR in the amount of the fair market value of the collateral, or $294,525, for conversion and recovery under the TLA, which provides that a person who commits theft "is liable for the damages resulting from the theft."[2] Mid-Atlantic also sought a statutory penalty of $1,000 for each instance of theft. For those automobiles that MSMTBR did not transfer title to a third party, Mid-Atlantic requested, in the alternative, restoration of good title.

In its answer, MSMTBR generally denied the allegations and raised the affirmative defenses of failure of consideration, waiver, and estoppel. MSMTBR alleged that Mid-Atlantic had first breached the Agreement by failing to pay all the sums due to MSMTBR.

In its summary-judgment motion, Mid-Atlantic argued that it was entitled to summary judgment as a matter of law on its conversion and TLA claims because there were no genuine issues of material fact. Mid-Atlantic explained that, after it had purchased the eighty-two installment sales contracts at issue, MSMTBR falsely certified to the DMV that MSMTBR was the "lienholder or authorized agent of the lienholder" on fifty-one of the automobiles and the "original title covering said vehicle[s] ha[d] been lost or destroyed." MSMTBR knew, however, that the titles had not been lost because it "had already sold all rights to those

---

[2]    *See id.* § 134.003.

vehicles" and had delivered the original titles to Mid-Atlantic. During the pendency of the lawsuit, MSMTBR returned to Mid-Atlantic five of the fifty-one contested Certificates of Title, but it refused to return the remaining forty-six or to produce two titles it had never delivered. Of those forty-eight vehicles, MSMTBR repossessed and resold at least twenty to third parties. Because Mid-Atlantic did not possess good title to any of the remaining fourteen vehicles, it was prevented from disposing of the three vehicles it had repossessed and could not deliver title to one customer who had paid for his vehicle in full.

Mid-Atlantic attached to its summary-judgment motion the Agreement and Limited Power of Attorney; the original title, as delivered by MSMTBR, for each contested installment sales contract; a "Decision Call Back" form; for each of the contested contracts, a "Guarantee of Title," wherein MSMTBR guaranteed "to provide [Mid-Atlantic] with a clean and marketable title to the collateral . . . within (45) forty-five days"; the title histories from the DMV listing MSMTBR as the holder of title for each of the fifty-one vehicles at issue; and MSMTBR's title applications.

Mid-Atlantic also attached the affidavit of Kimberly Yothers, a Mid-Atlantic employee who had care, custody, and control of its records concerning its transactions with MSMTBR. Yothers testified that MSMTBR had applied for and obtained substitute titles for "at least fifty-one" of the eighty-two automobiles for

6

which Mid-Atlantic had purchased the installment sales contracts; in each application, MSMTBR "certified" to the DMV that MSMTBR was the "lienholder or authorized agent of the lienholder" and the "original title covering said vehicle[s] has been lost or destroyed," although MSMTBR had already transferred title to Mid-Atlantic. Yothers explained that MSMTBR was "aware of and familiar with the terms of" the Agreement and the Power of Attorney.

In its response to Mid-Atlantic's motion, MSMTBR asserted that genuine issues of material fact precluded summary judgment. It asserted that Mid-Atlantic had breached the Agreement first by withholding $50,000 owed to MSMTBR and, as a result, MSMTBR began requesting lost titles from the DMV in an effort to mitigate its damages. It also asserted that fact issues existed as to its intent.

In its reply to MSMTBR's response, Mid-Atlantic denied first breaching the Agreement and asserted that MSMTBR had provided no evidence that Mid-Atlantic owed it $50,000. Mid-Atlantic argued that its summary-judgment evidence "conclusively" established MSMTBR's intent because it applied for substitute titles to vehicles that it knew it had already transferred to Mid-Atlantic.

After sustaining Mid-Atlantic's objections to MSMTBR's summary-judgment evidence, the trial court granted Mid-Atlantic summary judgment on its TLA and conversion claims. It awarded Mid-Atlantic $266,875 in actual damages, $50,000 in statutory damages on its TLA claim, and, alternatively, $266,875 in

7

damages on its conversion claim. The trial court also noted that MSMTBR had delivered original Certificates of Title for fourteen of the vehicles at issue, and it granted MSMTBR an $84,675 offset.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a plaintiff moves for summary judgment on its claim, it must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Only if the movant meets its burden does the burden shift to the non-movant to present evidence that would preclude summary judgment. *Steel*, 997 S.W.2d at 222–23. "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

8

### The Nature of MSMTBR's Claims

In its first issue, MSMTBR argues that the trial court erred in awarding Mid-Atlantic damages as a matter of law on its TLA and conversion claims, which constitute tort claims, because the duties MSMTBR allegedly breached "are based on contractual obligations that arise from an agreement between the parties" and, therefore, constitute contract claims only, and do not sound in tort.

Mid-Atlantic argues that MSMTBR waived this issue because it did not raise the argument in its response to Mid-Atlantic's summary-judgment motion. A movant must establish its entitlement to summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of its cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). Although, generally, a non-movant must expressly present to the trial court any ground that would defeat the movant's right to summary judgment, a non-movant needs no answer or response to contend on appeal that the grounds expressly presented to the trial court are insufficient as a matter of law to support the judgment. *Id.* at 678–79; *Landers v. State Farm Lloyds*, 257 S.W.3d 740, 746 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (noting that non-movant need not file response to defeat summary-judgment motion where "deficiencies in the movant's own proof or legal theories might defeat the movant's right to judgment as a matter of law"); *see also Argovitz v.*

*Argovitz*, No. 14-07-00206-CV, 2008 WL 5131843, at *8 (Tex. App.—Houston [14th Dist.] Dec. 9, 2008, pet. denied) (mem. op.).

Here, MSMTBR asserts on appeal that Mid-Atlantic's TLA and conversion claims constitute deficient legal theories upon which Mid-Atlantic may not recover. MSMTBR argues that Mid-Atlantic's summary-judgment evidence is insufficient as a matter of law to support the trial court's rendition of summary judgment on those claims. Thus, MSMTBR was not required to raise this issue in its response to Mid-Atlantic's motion for summary-judgment. *See Clear Creek*, 589 S.W.2d at 678. Accordingly, we address the issue.

"The acts of a party may breach duties in tort or contract alone or simultaneously in both." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). To determine whether claims sound in tort or contract we examine (1) the source of the duty allegedly breached and (2) the nature of the injury claimed. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

Contractual duties are those that arise from an agreement between parties. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 674 (Tex. App.—Houston [1st Dist.] 1996, no writ). Tort duties are those "imposed by law—apart from and independent of promises made [in a contract]—to avoid injury to others." *DeLanney*, 809 S.W.2d at 494. If the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim

10

generally sounds in contract. *Id.*; *Farah*, 927 S.W.2d at 674. If the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. *DeLanney*, 809 S.W.2d at 494.

Next, when the only loss or damage is the subject matter of the contract, the plaintiff's action is ordinarily on the contract. *Id.*; *Reed*, 711 S.W.2d at 618; *Farah*, 927 S.W.2d at 674. When the loss or damage is not the subject of the contract, the plaintiff's action is one in tort. *See Farah*, 927 S.W.2d at 674 (citing *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) (stating that commercial relations torts are not contractual even though they seek economic damages identical to cause of action in contract)).

In *DeLanney*, the plaintiff sued the defendant telephone company for negligence, alleging that it had negligently failed to perform its contract to publish an advertisement in its telephone book. 809 S.W.2d at 493. The jury found that the defendant was negligent in omitting the plaintiff's advertisement and awarded lost-profit damages. *Id.* at 494. The supreme court held that, because the plaintiff sought to impose liability for the breach of a duty created under the contract, rather than a duty imposed by law, and sought only damages for a failure to perform the contract, the claim sounded in contract. *Id.* at 494–95. Because the plaintiff had

not asserted a breach-of-contract claim, the court reversed the jury verdict and rendered judgment that the plaintiff take nothing. *Id.*

Here, both the duty allegedly breached and the nature of the injury claimed are independent from the duties and remedies contained in the Agreement. A duty to refrain from unlawfully or wrongfully appropriating the property of another arises under statutory and common law. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.002–.003 (Vernon 2011) (stating that person who commits theft, as defined in Texas Penal Code section 31.03 *et seq.*, is liable for damages resulting from theft); TEX. PENAL CODE ANN. §§ 31.03–.07, 31.11–.14 (Vernon 2011 & Supp. 2013) (defining theft); *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971) (defining conversion). Although the rights and obligations under the Agreement may serve as a defense to a claim of wrongful conversion or theft, nothing in the Agreement contemplates complete immunity from unlawful or wrongful appropriation. MSMTBR's alleged conduct, if proven, may give rise to liability because it breaches the Agreement. *See DeLanney*, 809 S.W.2d at 494; *Farah*, 927 S.W.2d at 674. But it also, if proven, may give rise to liability for conversion and theft if Mid-Atlantic proves it was the true owner and MSMTBR's actions were not justified under the Agreement or under any applicable defensive theory. *See DeLanney*, 809 S.W.2d at 494–95. Thus, Mid-Atlantic's claims can sound in tort.

12

Furthermore, Mid-Atlantic sought, and the trial court awarded, the value of the collateral and statutory penalties under the TLA. These damages, which arise from statute and common law, are independent of any benefit-of-the-bargain damages under the Agreement. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.005 (Vernon 2011) (specifying recovery); *United Mobile Networks L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997) (stating generally appropriate measure of damages for conversion is fair market value of property at time and place of conversion). When, as here, the loss or damage is not the subject of the contract, the plaintiff's action is one in tort. *See Farah*, 927 S.W.2d at 674.

In support of its argument, Mid-Atlantic relies on *Cass v. Stephens*, 156 S.W.3d 38 (Tex. App.—El Paso 2004, pet. denied), *cert. denied* 552 U.S. 819, 128 S. Ct. 115 (2007). In *Cass*, the plaintiff sued the defendants for breach of a joint operating agreement concerning oil service equipment and for conversion, alleging that the defendants had wrongfully appropriated jointly owned equipment for their own use. *Id.* at 47–50. The defendant argued that the conversion claim was barred as a matter of law because it sounded only in contract. *Id.* at 68–69. In concluding that the plaintiff's claim sounded in tort, the court reasoned that, notwithstanding the parties' agreement, the defendants breached a duty imposed by law not to appropriate the jointly owned equipment for their own use. *Id.* at 69. Such

13

conduct breached an obligation that existed outside the contract and therefore sounded in tort. *Id.*

Here, similar to *Cass*, MSMTBR was subject to a duty imposed by the TLA, the Texas Penal Code, and common law not to unlawfully or wrongfully appropriate Mid-Atlantic's property for its own benefit. *See id.*; *see also DeLanney*, 809 S.W.2d at 494. Further, the trial court issued statutory penalties and awarded damages based on the fair market value of the collateral, rather than on any measure of damages under the Agreement. *See Farah*, 927 S.W.2d at 674.

Accordingly, we hold that Mid-Atlantic's TLA and conversion claims may sound in tort independent of a contractual duty, and we overrule MSMTBR's first issue.

**Texas Theft Liability Act**

In its second issue, MSMTBR argues that the trial court erred in granting Mid-Atlantic summary judgment on its TLA claim because there are genuine issues of material fact regarding MSMTBR's intent to deprive Mid-Atlantic of its property as MSMTBR was "not prohibited from protecting its own interests."

A person who commits theft, as defined under the Texas Penal Code, "is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.002–.003; TEX. PENAL CODE ANN. §§ 31.03–.07, 31.11–.14. A person commits the offense of theft if he "unlawfully appropriates property with

14

intent to deprive the owner of property" without the owner's "effective consent." TEX. PENAL CODE ANN. § 31.03(a)–(b). "Appropriate" is defined as "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another" or "to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2011). An "owner" is "a person who . . . has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor[.]" *Byrd v. State*, 336 S.W.3d 242, 251 (Tex. Crim. App. 2011) (citing TEX. PENAL CODE ANN. § 1.07(a)(35)(A) (Vernon Supp. 2013)).

Mid-Atlantic first asserts that MSMTBR appropriated the automobiles that were serving as collateral for the installment sales contracts at issue by acquiring substitute titles to the automobiles and then repossessing and reselling them—all with the intent to deprive Mid-Atlantic of its property, i.e., its security interest. As its evidence of MSMTBR's intent, Mid-Atlantic points to the testimony of Kimberly Yothers. Yothers explained that "[f]or eighty of the[] contracts, MSMTBR delivered original titles to [Mid-Atlantic] for the vehicles which secured payment of the underlying consumer installment obligations"; Mid-Atlantic

15

"possessed, and continues to possess, the original titles for each of these vehicles";

and MSMTBR then "applied for and obtained substitute titles for at least fifty-one

of the vehicles" by "falsely certifying to the DMV" that it was the "lienholder or

authorized agent of the lienholder" and the original titles had been "lost or

destroyed." MSMTBR then repossessed and resold some of the vehicles. Mid-

Atlantic argues that this evidence conclusively establishes MSMTBR's intent to

deprive Mid-Atlantic of its property because it shows MSMTBR's "conscious

objective or desire . . . to engage in the conduct or cause the result." *See* TEX.

PENAL CODE ANN. § 6.03(a).

MSMTBR responds, noting that nothing in the Agreement or Limited Power

of Attorney made Mid-Atlantic the owner of the vehicles or allowed Mid-Atlantic

to repossess the vehicles for its own account.[3] MSMTBR further notes that

nothing prohibited it from acting to protect its own security interests. Moreover, it

is undisputed that MSMTBR remained the lienholder of record.

Mid-Atlantic next asserts that it "never claimed it owned the vehicles," but

only that it "owned the security interests in the Contracts, and possessed sole rights

to deal with the collateral." And "[a]lthough the titles themselves continued to list

---

[3]    Although the trial court struck MSMTBR's evidence attached to its summary-judgment response and, thus, MSMTBR presented no evidence, MSMTBR did not have a burden to raise a fact issue unless Mid-Atlantic first met its burden to conclusively demonstrate its right to summary judgment. *See* TEX. R. CIV. P. 166a(c); *Rhone Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999).

16

MSMTBR as the denominated lienholder," the Agreement and Limited Power of Attorney "necessarily conferred exclusive ownership rights over the vehicles, as security, on Mid-Atlantic."

Specifically, Mid-Atlantic notes that, with respect to each installment sales contract, the Agreement provides that Mid-Atlantic was the first lien holder:

Section I: Purchase of Contracts

. . . .

Seller Obligations

(a) With respect to each Contract [MSMTBR] hereby represents, warrants and covenants unto [Mid-Atlantic] as follows:

. . . .

8. [MSMTBR] or its predecessor-in-interest, or their agents or affiliated agents[,] registered all vehicles described in the [consumer contract] in compliance with the vehicle laws of the state in which the respective Customer resides, showing the Customer as registered owner and [Mid-Atlantic] as first perfected lienholder (secured party);

. . . .

20. Notwithstanding any other provisions hereof, [MSMTBR] warrants that each [consumer contract] is secured by a valid and legal perfected first lien on the collateral.

Thus, under paragraph eight, MSMTBR warranted that it had registered each automobile, showing the customer as the registered owner and Mid-Atlantic as the "first perfected lienholder." Paragraph twenty, however, indicates that MSMTBR

17

warranted that, notwithstanding any other provision, it had generally perfected a first lien.

Mid-Atlantic further asserts that the Limited Power of Attorney granted it the power to act in "complete substitution" for MSMTBR. In support of its argument, Mid-Atlantic cites *Nelson v. Consumers County Mutual Insurance Company*, 326 S.W.2d 535 (Tex. Civ. App.—San Antonio 1959, writ dism'd). In *Nelson*, however, the language in the power of attorney provided that any loss was payable to the finance company and allowed the finance company to proceed in its own name and receive the full proceeds for its own account. *Id.* at 537–38.

Here, MSMTBR's *Limited* Power of Attorney expressly limits Mid-Atlantic to acting "in [MSMTBR's] name[], place and stead, and for [MSMTBR's] use and benefit." Thus, unlike in *Nelson*, Mid-Atlantic was not granted general power to proceed in its own name or for its own account. *See id.*

The Limited Power of Attorney does recite that it grants a power coupled with an interest. However, considering this language in light of the entire writing, which authorizes Mid-Atlantic to act only for MSMTBR's account, and indulging every reasonable inference and resolving any doubts in non-movant MSMTBR's favor, as we must, we conclude that the interest granted is in the proceeds, and not the automobiles.

18

That Mid-Atlantic was granted only an interest in receiving payment is supported by other provisions of the Agreement and the Decision Callback form, which together reflect that Mid-Atlantic was to pay MSMTBR only an upfront fee for each consumer contract.[4] And, as each consumer performed on its Contract by making payments to Mid-Atlantic, Mid-Atlantic was to make payments to MSMTBR. Thus, the Agreement contemplated sums owed to MSMTBR even after the sale of each Contract.

Further, in its petition, Mid-Atlantic asserted that for the installment sales contracts it purchased under the Agreement, it agreed to pay $364,498.27, of which it "immediately paid" $234,526.94, "with the balance becoming due *if* the underlying Contract[s] performed for an agreed upon period." (Emphasis added.) Thus, a defaulting consumer may render both Mid-Atlantic and MSMTBR unpaid. The Agreement reflects that Mid-Atlantic's right to payment was at all times protected by provisions that required MSMTBR to repurchase a Contract in the

---

[4]   For example, a Decision Callback dated October 28, 2010 covered three of the installment sales contracts with a principal value of approximately $21,400, of which MSMTBR would receive an Advance to Seller of approximately $8,400. An additional $11,700 would be set aside in the Special Reserve and the Bonus Pool, and Mid-Atlantic received an upfront discount of $1,300. Assuming the installment sales contracts performed as agreed, Mid-Atlantic would receive the discount and all interest, and MSMTBR would receive the remaining funds from the Bonus Pool and Special Reserve.

19

event of a default by a consumer.[5]  Mid-Atlantic does not direct us to any summary-judgment evidence conclusively showing that its purchase of an installment sales contract meant that MSMTBR was "no longer entitled to exercise any rights as a lienholder."

Taking as true all evidence favorable to MSMTBR and indulging every reasonable inference and resolving any doubts in its favor, as we must, we conclude that Mid-Atlantic's summary-judgment evidence does not conclusively show that Mid-Atlantic had a superior right to possession of the automobiles or that MSMTBR was prohibited from acting to protect its own interests.  *See Dorsett*, 164 S.W.3d at 661.  We therefore conclude that Mid-Atlantic's summary-judgment evidence does not conclusively establish that MSMTBR acted with the intent to deprive Mid-Atlantic of its property.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.003; TEX. PENAL CODE ANN. § 31.03(a).  We hold that Mid-Atlantic did not meet its burden to conclusively establish its entitlement to summary judgment as a matter of law on its TLA claim.  *See* TEX. R. CIV. P. 166a(c); *Steel*, 997 S.W.2d at 223; *Siegler*, 899 S.W.2d at 197.

Accordingly, we sustain MSMTBR's second issue.

---

[5]  The Agreement provides that if a consumer defaulted on the installment sales contract in the first six months, Mid-Atlantic could recover its losses by demanding that MSMTBR repurchase the installment sales contracts or by repossessing and selling the vehicles, and applying the proceeds to MSMTBR's benefit.  If the consumer defaulted after the sixth month, the Agreement provides for a "Seller Bonus Pool" to offset any deficiency to Mid-Atlantic.

20

## Conversion Claim

In its third issue, MSMTBR argues that the trial court erred in granting Mid-Atlantic summary judgment on its conversion claim because there are genuine issues of material fact regarding MSMTBR's intent to wrongfully "exercise[] dominion over the vehicles."

Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights. *Waisath*, 474 S.W.2d at 447. Conversion may be committed against one who has legal possession regardless of the question of title. *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 39 (Tex. App.—Dallas 2003, pet. denied). A conversion defendant must intend to assert some right in the property. *Id.* at 40.

To prevail on its conversion claim on summary judgment, Mid-Atlantic had to conclusively prove all of the elements of conversion, which are that (1) it owned, had legal possession, or was entitled to possession of the property, (2) MSMTBR assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Mid-Atlantic's rights, and (3) MSMTBR refused Mid-Atlantic's demand for return of the property. *See Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

21

To support the element of intent in its summary-judgment motion on its conversion claim, Mid-Atlantic directs us to Yothers's testimony, again asserting that Mid-Atlantic "is the owner of the installment sales contracts and all rights to the collateral securing the underlying retail installment loans," and, "by fraudulently applying for Certified copies of Title, and in most cases, repossessing and reselling the collateral, MSMTBR has exercised dominion and control over the personal property of another, unlawfully and without authorization, and to the exclusion of, or inconsistent with, [Mid-Atlantic's] rights."

Again, we must take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *See Dorsett*, 164 S.W.3d at 661. As discussed under Mid-Atlantic's TLA claim, it is undisputed that the structure of the Agreement was for Mid-Atlantic to make an initial payment to MSMTBR for each installment sales contract, "with the balance becoming due if the underlying Contract[s] performed for an agreed upon period." (Emphasis added.) Mid-Atlantic does not direct us to any provision of the Agreement that expressly prohibited MSMTBR from acting to protect its own interests. The Limited Power of Attorney expressly provides authorization for Mid-Atlantic to act on behalf of MSMTBR.

We conclude that Mid-Atlantic has not conclusively established that MSMTBR acted with the intent to assume and exercise dominion and control over

22

Mid-Atlantic's property in an unlawful and unauthorized manner. *See Orandy*, 105 S.W.3d at 63. We hold that Mid-Atlantic did not meet its burden to conclusively establish its entitlement to summary judgment as a matter of law on its conversion claim. *See* TEX. R. CIV. P. 166a(c); *Steel*, 997 S.W.2d at 223; *Siegler*, 899 S.W.2d at 197.

Accordingly, we sustain MSMTBR's third issue.

## Conclusion

We reverse the judgment of the trial court on Mid-Atlantic's TLA and conversion claims and remand the case to the trial court for further proceedings.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.